**Stephen THOMPSON, Appellant,**

v.

**William P. CLARK, Secretary of the Interior, et al.**

No. 82–1528.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1983.

Decided Aug. 7, 1984.

Charles A. Price, Washington, D.C., for appellant.

Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., with whom Edward J. Shawaker, Atty., Dept. of Justice, Washington, D.C., was on brief, for appellees. William E. Hill, Jacques B. Gelin and Peter R. Steenland, Jr., Attys. Dept. of Justice, Washington, D.C., also entered appearances for appellees.

Jere W. Glover, Washington, D.C., for amicus curiae, urging reversal.

Before ROBINSON, Chief Circuit Judge, SCALIA, Circuit Judge, and McGOWAN, Senior Circuit Judge.

SCALIA, Circuit Judge.

Appellant Stephen Thompson, an independent oil and gas developer, seeks review of the District Court's dismissal of his application for declaratory and injunctive relief against the appellees, Secretary William P. Clark and the Department of the Interior. *Thompson v. Watt*, Civ. Action No. 82–0535 (D.D.C. Mar. 17, 1982). In that action appellant challenged the validity of a final rule, promulgated by the Secretary, increasing the application and rental fees charged for certain noncompetitive federal oil and gas leases. The principal question presented on appeal is the scope of judicial review of agency action under the Regulatory Flexibility Act of 1980, 5 U.S.C. §§ 601–612 (1982).

I

The Secretary of the Interior ("the Secretary") administers the disposal of federal onshore oil and gas lands (*i.e.*, rights to the oil and gas deposits) under authority delegated to him by the Mineral Lands Leasing Act of 1920, 41 Stat. 437, as amended, 30 U.S.C. § 181 *et seq.* (1982), and the Mineral

Leasing Act for Acquired Lands, 61 Stat. 913 (1947), as amended, 30 U.S.C. § 351 *et seq.* (1982): The law establishes two basic regimes for allocating onshore oil and gas lands: "competitive leases" with five-year terms, for land located within a known geological structure of a producing oil and gas field, 30 U.S.C. § 226(b), (e); and "noncompetitive leases" with ten-year terms, for other lands, 30 U.S.C. § 226(c), (e). Only the latter is at issue in this case.

The noncompetitive leasing program consists of two subprograms (established by regulation): the so-called "Over-The-Counter" ("OTC") and "Simultaneous Oil and Gas" ("SOG") Offer systems. The former applies to federal lands which have never been previously leased; the latter to lands whose leases have been cancelled, relinquished, terminated or allowed to expire. 43 C.F.R. Subparts 3111, 3112 (1983). OTC leases are made on a first-come, first-served basis; SOG leases are allocated by lottery. Applications for both must be accompanied by a *nonrefundable* filing fee, and successful applicants pay an annual per acre rental fee.

Filing and rental fees have traditionally been established by regulation, *see, e.g.,* 11 Fed.Reg. 12952, 12953–54, 12960 (1946), with the latter subject to certain statutory minima, *see, e.g.,* 30 U.S.C. § 226(d). Prior to 1981, the filing and rental fees for all noncompetitive leases had been set at $10 and $1 per acre, respectively. 43 C.F.R. §§ 3103.1–3, 3103.3–2(a) (1980). As a part of the Omnibus Budget Reconciliation Act of 1981, 95 Stat. 357, Congress established a statutory minimum of $25 for the filing fee (which the Secretary promptly implemented, *see* 46 Fed.Reg. 45887 (1981)), and directed that any increases above $25 be established by regulation. 95 Stat. 748, § 1401(d)(1). The Act also instructed the Secretary to report to Congress on the feasibility of raising the rental fee on OTC and SOG leases from the levels which the regulations currently provided. *Id.* at 748–49, § 1401(d)(2). On October 29, 1981, the Department published a Notice of Proposed Rulemaking ("NPRM") to increase the filing fee for all noncompetitive leases from $25 per application to $75; and the rental fee for SOG leases from $1 per acre for each year in the life of the lease to $1 per acre for each of the first five years and $3 per acre for each of the last five. 46 Fed.Reg. 53645 (1981).

Sections 603 and 604 of the Regulatory Flexibility Act of 1980, 5 U.S.C. §§ 603, 604, require that when an agency proposes (§ 603) and promulgates (§ 604) a rule subject to § 553 of the Administrative Procedure Act, 5 U.S.C. § 553 (1982), it shall prepare and make available to the public an initial (§ 603) and final (§ 604) "regulatory flexibility analysis," describing *inter alia* the impact of the rule on small entities. The requirement can be eliminated, however, by the agency head's certification, under § 605(b), that the rule "will not ... have a significant economic impact on a substantial number of small entities."[1] The Director of the Bureau of Land Management certified to this effect, based upon a report prepared by his agency. U.S. Department of the Interior, Bureau of Land Management, *Determination of Effects of Rules* (Oct. 22, 1981), Administrative Record ("A.R.") at 1. The NPRM, which was signed by the Assistant Secretary of the Interior with authority over the Bureau of Land Management, included a statement to the same effect. 46 Fed.Reg. at 53645.[2]

---

1.  5 U.S.C. § 605(b) provides as follows:

    Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register, at the time of publication of general notice of proposed rulemaking for the rule or

at the time of publication of the final rule, along with a succinct statement explaining the reasons for such certification, and provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration.

2.  The certification by the Director of the Bureau of Land Management was not published, as § 605(b) requires; the statement by the Assis-

Upon publication of this proposed regulation to increase fees and rentals, the Department received 1,854 written comments, which it considered and purported to summarize in its statement promulgating the final rule on January 20, 1982. 47 Fed. Reg. 2864. This published notice included the Assistant Secretary's statement that the agency had determined the rule would not have a significant economic effect on a substantial number of small entities. On February 19, 1982, the rule became effective; five days later, appellant filed this action in district court for declaratory judgment and injunction, under the venue provision of the Administrative Procedure Act governing cases in which no special statutory review proceeding has been provided, 5 U.S.C. § 703.

In his complaint, appellant alleged in successive counts that appellees (1) had violated § 558(b) of the Administrative Procedure Act [3] by issuing this regulation in a manner not authorized by § 605(b) of the Regulatory Flexibility Act; (2) had violated § 558(b) of the Administrative Procedure Act by issuing this regulation without compliance with the requirements of § 553(c) of that Act;[4] and (3) by both of the aforesaid violations, had denied appellant his due process rights under the Fifth Amendment. The District Court dismissed the complaint, concluding that the Department had complied with § 553(c) of the Administrative Procedure Act and that the court lacked jurisdiction to review compliance with §§ 603–605 of the Regulatory Flexibility Act. The Memorandum Opinion did not separately address appellant's due process claim. Thompson now appeals the denial of his Administrative Procedure Act and Regulatory Flexibility Act claims.

---

tant Secretary was published, but was not phrased as a certification.

**3.** 5 U.S.C. § 558(b) provides as follows:

A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law.

**4.** 5 U.S.C. § 553(c) provides, in relevant part, as follows:

## II

Appellant's assertion that appellees failed to comply with § 605(b) of the Regulatory Flexibility Act rests upon two contentions, the first directed to substance and the second to procedure: First, that insufficient evidence exists in the record to support the agency's certification that the regulation will have no significant economic effect on a substantial number of small entities. And second, that appellees have disregarded the procedural requirements of § 605(b), primarily by failing to publish the requisite succinct statement of reasons which explains the certification.

■ The threshold issue raised by both contentions is whether (or to what extent) judicial review is precluded by the Regulatory Flexibility Act. *See* 5 U.S.C. § 701(a)(1). As the Supreme Court has most recently expressed the test that guides our inquiry: "[W]here substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling," but that presumption is overcome whenever "congressional intent to preclude judicial review is 'fairly discernible' in the detail of the legislative scheme." *Block v. Community Nutrition Institute,* —— U.S. ——, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), *quoting Data Processing Service v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970).

■ The express language of the Regulatory Flexibility Act leaves little to the imagination on the issue of judicial review. Section 611 provides as follows:

(a) Except as otherwise provided in subsection (b), any determination by an

---

After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

agency concerning the applicability of any of the provisions of this chapter to any action of the agency shall not be subject to judicial review.

(b) Any regulatory flexibility analysis prepared under sections 603 and 604 of this title and the compliance or noncompliance of the agency with the provisions of this chapter shall not be subject to judicial review. When an action for judicial review of a rule is instituted, any regulatory flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review.

Section 611(a) is dispositive with respect to appellant's substantive claim. The certification that §§ 603 and 604 do not apply to this rulemaking because the rule will not have a significant economic impact on a substantial number of small entities cannot possibly be understood as anything other than a "determination by an agency concerning the applicability of any of the provisions of this chapter." Similarly, § 611(b) is dispositive with respect to the procedural claim. The alleged failure to publish a statement of reasons as § 605 requires surely calls into question "compliance or noncompliance of the agency with the provisions of this chapter."

■■■ Appellant seeks to avoid the plain import of § 611 by raising a "logical dilemma," Appellant's Brief at 12, posed by the last sentence of § 611(b), which makes any regulatory flexibility analysis prepared by an agency part of the record subject to scrutiny on review of the final rule. That, according to appellant, compels the interpretation that Congress intended to prohibit only *interlocutory* review of alleged violations of the Regulatory Flexibility Act; but meant to allow review in connection with judicial examination of the final rule. We do not agree. Even the most subtle and sadistic of draftsmen would not choose to convey the plain notion that review of compliance with the Regulatory Flexibility

Act is available only in connection with a challenge to the final rule by saying that review is unavailable, but the regulatory flexibility analysis becomes part of the record when the final rule is appealed. The last sentence of § 611(b) means that the reviewing court will consider the contents of the preliminary or final regulatory flexibility analysis, along with the rest of the record, in assessing not the agency's compliance with the Regulatory Flexibility Act, but the validity of the rule under other provisions of law. Thus, if data in the regulatory flexibility analysis—or data anywhere else in the rulemaking record—demonstrates that the rule constitutes such an unreasonable assessment of social costs and benefits as to be arbitrary and capricious, 5 U.S.C. § 706(2)(A), the rule cannot stand. Moreover, as we said in *Small Refiner Lead Phase-Down Task Force v. EPA,* 705 F.2d 506 (D.C.Cir.1983), a defective regulatory flexibility analysis *"may lead a court to conclude that the rule is unreasonable,"* id. at 538 (emphasis added), and "a reviewing court should consider the regulatory flexibility analysis *as part of its overall judgment* whether a rule is reasonable and *may, in an appropriate case,* strike down a rule because of a defect in the flexibility analysis," id. at 539 (emphasis added). For example, if a defective regulatory flexibility analysis caused an agency to underestimate the harm inflicted upon small business to such a degree that, when adjustment is made for the error, that harm clearly outweighs the claimed benefits of the rule, then the rule must be set aside. It is set aside, however, *not* because the regulatory flexibility analysis was defective, but because the mistaken premise reflected in the regulatory flexibility analysis deprives the rule of its required rational support, and thus causes it to violate—not any special obligations imposed by the Regulatory Flexibility Act—but the general legal requirement of reasoned, nonarbitrary decisionmaking, 5 U.S.C. § 706(2)(A).[5]

---

**5.** In *Sargent v. Block,* 576 F.Supp. 882, 893 (D.D.C.1983), the district court appears to have misinterpreted our *Small Refiner* opinion, though without any effect upon the outcome since no failure to comply with the Regulatory Flexibility

The appellant and amicus would resort to the legislative history of the Act for clarification, where they think to find support for their interpretation. Although we find it unnecessary to consider the legislative history in light of the unambiguous language precluding judicial review, *see United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1280, 6 L.Ed.2d 575 (1961), we note that, far from supporting appellant's interpretation, it confirms our analysis.

The immediate antecedents of the Regulatory Flexibility Act were H.R. 4660, 96th Cong., 1st Sess. (1979), and S. 299, 96th Cong., 2d Sess. (1980), as reported out by the Senate Judiciary Committee, 126 CONG. REC. 21,448–49 (1980). Neither of those bills restricted judicial review of agency compliance with the Act, *see* H.R.Rep. No. 519, 96th Cong., 1st Sess. 11–12 (1979); S.Rep. No. 878, 96th Cong., 2d Sess. 9–10 (1980), U.S.Code Cong. & Admin.News 1980, p. 2788, and this feature was vigorously opposed by the Administration. The Director of President Carter's Regulatory Council testified that "it is important that any statute not lead to increased litigation," and that "[n]o provision should change the substantive statutory standards for rules or create new grounds for dilatory legal challenges." *Regulatory Reform: Hearings on S. 104, S. 262, S. 299, S. 755 and S. 1291, Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary*, 96th Cong., 1st Sess. 5 (Pt. 3) (1979) (statement of Peter J. Petkas). Those bills were rejected by the Senate in favor of a substitute offered by Senator Culver on the floor, *see* 126 CONG.REC. 21,449–51 (1980). The Culver substitute, supported by the Administration, *see* 126 CONG.REC. 21,452 (1980) (letter of support from Chief Counsel for Advocacy for Small Business); President's Statement on Senate Approval of S. 299, 16 WEEKLY COMP.PRES.DOC. 1508 (Aug. 6, 1980), passed both houses without amendment and constitutes the Act we have before us.

Senator Culver's section-by-section analysis of his substitute—the only authoritative legislative history in the record—contains the following discussion of the judicial review provision:

> Section 611(a) states that agency determinations concerning whether the provisions of the bill apply to any action by the agency—including a decision by the agency head to certify that a rule will not have a significant economic effect on small entities—shall not be subject to judicial review . . . . [I]t is clearly stated that neither the regulatory flexibility analyses themselves (required by Sections 603 and 604) nor agency compliance or noncompliance with the provisions of this subchapter shall be subject to judicial review, either pursuant to this act, or section 706 (2)(D) of this title, or any other provision of law.
>
> . . . .
>
> Section 611(b) provides that the contents of the regulatory flexibility analysis shall, to the extent relevant to an issue before the court, be available to and considered by a court when the court is determining the validity of the rule which is the subject of the analysis.

126 CONG.REC. 21,457 (1980). Speaking more specifically to the narrow aspect of reviewability immediately involved in the present case, Senator Culver's report said the following:

> This means, for example, that the decision by an agency with respect to what proposed rules would have a significant economic impact on a substantial number of small entities pursuant to Section 605(b) shall not be subject to judicial review. Thus, the decision regarding when the agency shall conduct a regulatory flexibility analysis remains in the sole discretion of the agency.

126 CONG.REC. 21,460–61 (1980).

In opposition to this analysis, which is as clear as the language of the statute itself, amicus relies upon various statements made by individual Members of Congress on the House floor. We have examined the

Act was found. Compliance with the Act should not have been reviewed.

record of the House debate and find that all except one of the statements that purportedly support the principle of judicial review in fact do little except track or paraphrase the statutory language (particularly the provision that the regulatory flexibility analysis "shall constitute part of the whole record of agency action in connection with ... review" of the rule)—and accompany that recital with an assertion that this prevents interlocutory appeals (which, under any view of the matter, it unquestionably does) or with a triumphal pronouncement that this is a vindication of judicial oversight. *See, e.g.,* 126 CONG.REC. 24,579 (1980) (statement of Rep. Kastenmeier); *id.* at 24,581 (statement of Rep. Bedell). Only one statement goes beyond such uninstructive generalization to an assertion that flatly contradicts the analysis we have set forth above: Representative McDade said that if an agency erroneously concludes there is no significant impact on small entities "it is the intent of our committee that the court[s] should strike down the regulation." 126 CONG.REC. 24,583 (1980). McDade, like almost all of those who made floor remarks favoring judicial oversight of compliance with the Regulatory Flexibility Act, was a member of the Small Business Committee which had unanimously endorsed the rejected H.R. 4660, which did not prohibit judicial review. On the point at issue here, his characterization of the effect of the legislation is not reliable. *See American Trucking Associations v. ICC,* 659 F.2d 452, 459 (5th Cir. 1981) (need for caution in relying on legislative commentary, some of which is designed to impress constituents or influence judicial interpretation); *accord, National Small Shipments v. CAB,* 618 F.2d 819, 828 (D.C.Cir.1980). Representative Danielson, whose Subcommittee on Administrative Law and Governmental Relations of the House Judiciary Committee had considered comprehensive regulatory reform legislation, was quite aware of the importance of the judicial review issue and of the distortion which members of the Small Business Committee were introducing:

Comment has been made, as to the subject matter of judicial review, to the effect that judicial review is provided for in this bill. I should like to point out that section 611 on page 15 of the bill provides as follows:

[§ 611(a)].

Insofar as there may be Members who feel that judicial review is encompassed within this bill, I trust that the foregoing reference to the language of the bill itself will set that point straight.

126 CONG.REC. 24,590 (1980) (remarks of Rep. Danielson). In the last analysis, we do precisely what Representative Danielson urged his colleagues to do. We rely upon the language of the statute.

The clarity of the statutory text and its legislative history is not beclouded by the sentence of § 608(b) which provides that "[i]f the agency has not prepared a final regulatory analysis pursuant to section 604 of this title within one hundred and eighty days from the date of publication of the final rule, such rule shall lapse and have no effect." That sentence is contained within a section entitled "Procedure for waiver or delay of completion," and is meant to describe the consequence that ensues if and when an agency promulgates a rule with a written finding that it is "in response to an emergency that makes timely compliance with the provisions of section 604 ... impracticable." § 608(b). In that situation the emergency rule "lapses" (but is not invalidated *ab initio* ) unless the regulatory flexibility analysis is produced within 180 days. Obviously, some judicial action may be called for in order to pronounce and enforce the "lapse"—but the judicial determination at issue relates not to "compliance or noncompliance" with the Regulatory Flexibility Act, but to the mere fact that the rule was promulgated on an emergency basis and was not followed by a regulatory flexibility analysis within 180 days. To read this provision as applying to all rules, even those not promulgated on an emergency basis under § 608, would create a strange situation in which sanction for failure to publish a regulatory flexibility analysis due upon promulgation will not be

imposed so long as an analysis is published half a year later (which is, it may be noted, well past the deadline for appeal of agency rulemaking under many statutes, *see, e.g.,* 15 U.S.C. § 1394 (1982) (60 days to review National Highway Traffic Safety Administration motor vehicle safety rules))—and even then the sanction will consist not of invalidation of the rule but of mere lapse, *i.e.,* refusal to extend the agency's six-month free ride. It seems to us clear that operation of the sentence in question is limited to the context of the subsection in which it is contained—issuance of rules on an emergency basis. Its function is not to provide judicial review of failure to complete a regulatory impact analysis, contrary to the clear language of § 611; but to relieve agencies of their (nonreviewable) obligation to complete such analyses with respect to emergency rules of six months' duration.

■ To say that an agency's compliance with the Regulatory Flexibility Act is not reviewable *as such* is not to say that the agency can ignore with impunity the effect of its rules upon small entities. As noted earlier, when an agency prepares regulatory flexibility analyses pursuant to §§ 603 and 604, the court will consider their contents (including any defects they may contain) "as part of its overall judgment whether a rule is reasonable" under 5 U.S.C. § 553. *Small Refiner Lead Phase-Down Task Force v. EPA, supra,* 705 F.2d at 539. Moreover, even when an agency decides (rightly or wrongly, and with or without compliance with the requisite procedures) that it need not prepare regulatory flexibility analyses, the impact of the rule upon small entities can be placed at issue in the public comments, and the agency's failure to make adequate response to serious alleged deficiencies in this regard can of course be grounds for reversal. *See Home Box Office v. FCC,* 567 F.2d 9, 35–36 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Indeed in the present case, the same issues raised by appellant's substantive challenge under the Regulatory Flexibility Act, unreviewable as such, are reviewed here in connection with

appellant's claim that the Secretary failed to consider comments in the record regarding the effect of the rule on small entities. It is to that inquiry that we now proceed.

### III

Appellant claims that the Department's failure to respond to 1,854 written comments violated its obligation under 5 U.S.C. § 553(c) "to consider all relevant matter submitted by interested persons in connection with [the] rulemaking proceeding." Appellant's Brief at 16. In its promulgation of the final rule the Department acknowledged receipt of the comments, but concluded after what it said was "careful review" that "[m]ost of the comments were simply a statement of opposition or support," and no "substantive views" or "compelling argument[s] [opposed to] the proposed increases" were presented. 47 Fed. Reg. at 2864. The District Court held that the Department had complied with the requirements of § 553(c) and dismissed the count.

■ Section 553(c) provides:

[T]he agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

This section has never been interpreted to require the agency to respond to every comment, or to analyse every issue or alternative raised by the comments, no matter how insubstantial. *See Automotive Parts & Accessories Ass'n v. Boyd,* 407 F.2d 330, 338 (D.C.Cir.1968). To the contrary, the Supreme Court has emphatically instructed us that:

administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that "ought to be" considered and then, after

failing to do more, to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented."

*Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 553–54, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not "based on a consideration of the relevant factors," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). *See Home Box Office, supra,* 567 F.2d at 36.

Here the Department clearly identified the reasons for its action in its Notice of Proposed Rulemaking: "a filing fee of $75 is necessary to ensure the integrity of the leasing system, to decrease casual speculation and to encourage prompt acquisition of leases on Federal lands by those able and anxious to develop .... [T]he increase in the rental fee will encourage more timely exploration for oil and gas and discourage the holding of large inventories of Federal lands for long periods of time." 46 Fed. Reg. 53645 (1981). Those conclusions were based upon Department studies and the economic theory of lotteries. *See* Final Regulatory Impact Analysis, A.R. at 37; Affidavit of Abraham Haspel, Addendum to Department of Interior Brief.

None of the comments singled out by appellant as raising substantial issues contained any meaningful analysis or data refuting the agency's conclusions. A few simply denied the validity of the Department's plausible prediction that application fee increases would (by discouraging disguised multiple filings) promote the integrity of the system. The rest either suggested, again without any serious analysis or data, that the Department consider alternatives, such as phasing in fee and rent increases over time and creating a sliding scale of annual rents based on total acreage, or (the vast majority) complained that the increases would drive out small participants and concentrate leases in the hands of large corporations. With regard to the latter point, the Department's analysis supporting the rule (referred to and made publicly available in the NPRM) noted that most oil and gas developers now acquire their leases, not from the lottery, but in the assignment market—which is composed of land brokers and "casual" speculators who have won leases in the lottery but have no intention of exploiting the land themselves. Far from harming small independent producers, the Department expected the new regulation to help them, since the higher costs of applying for and holding the leases would drive the "casual" speculators out of the lottery. This would greatly increase the chances of a producer's obtaining a lease directly; and even where the producer himself was not the winner, he would find it cheaper and less time-consuming to deal with land brokers than to locate and bargain with "casual" speculators. *See* Final Regulatory Impact Analysis 9–10, A.R. at 50–51. None of the comments provided data or analysis to establish, or even asserted, that these benefits would not ensue. To the extent they complained that small casual speculators would be eliminated, they brought to the attention of the agency nothing which it had not already considered. The Department not only did not deny that consequence, but hoped to achieve it, since it viewed its mission as the fostering of oil and gas development rather than oil and gas lease speculation. Some of the comments asserted that the eliminated casual speculators would include some who were independent producers as well—but that is neither a startling revelation nor (without some statistics contradicting the Department's estimation that a larger number of *winning* producers would remain) destructive of the Department's rationale.

▮ While the Department's statement, in promulgating the final rule, that "no substantive views [had been] presented," 47 Fed.Reg. at 2864, may have been an exaggeration, it was at least true that nothing had been presented which required some explanation beyond that already contained within the rulemaking record to as-

sure us that "all relevant factors· ha[d] been considered," *Home Box Office, supra,* 567 F.2d at 36. We thus agree with the judgment of the district court that the agency fully complied with the requirements of 5 U.S.C. § 553(c).

*Judgment affirmed.*