**AMERICAN MINING CONGRESS; National Coal Association; National Council of Coal Lessors; National Aggregates Association; American Iron & Steel Institute, Petitioners,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.**

**No. 91–70176.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1991.

Decided May 27, 1992.

---

John A. Macleod, Crowell & Moring, Washington, D.C., for petitioners.

Randolph L. Hill, E.P.A., Washington, D.C., for respondent.

Before PREGERSON, FERGUSON, and O'SCANNLAIN, Circuit Judges.

FERGUSON, Circuit Judge:

The American Mining Congress ("AMC") challenges the Environmental Protection Agency's ("EPA's") recent Clean Water Act ("CWA") storm water discharge rule, National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 55 Fed.Reg. 47,-990, 48,065 (1990) (to be codified at 40 C.F.R. § 122.26(b)(14)(iii)), because it requires storm water discharge permits for "inactive mining operations." *Id.* at 48,-065. AMC contends that the rule contravenes Congressional intent, is arbitrary and capricious, is improperly retroactive, and was promulgated in violation of certain procedural requirements. We uphold EPA's storm water rule.

## I

## BACKGROUND

Congress enacted the CWA [1], 33 U.S.C.A. §§ 1251–1387 (West 1986 & Supp.1991), "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C.A. § 1251(a). *See Rybachek v. EPA,* 904 F.2d 1276, 1282 (9th Cir.1990). The Act seeks to accomplish this objective principally by controlling "point source" pollution.[2]

■ The Act prohibits the "discharge of any pollutant" from a point source except as authorized by a National Pollutant Discharge Elimination System ("NPDES") permit. *See* CWA § 301(a), 33 U.S.C. § 1311(a); CWA § 402, 33 U.S.C. § 1342. The CWA authorizes EPA to issue an NPDES permit containing conditions that implement various requirements of the Act. CWA § 402(a)(1), 33 U.S.C. § 1342(a)(1).[3]

Storm water discharges are a significant source of environmental pollution. 55 Fed. Reg. at 47,990–92; *see* 132 Cong.Rec. 32,-381 (1986). Since 1973, EPA has issued several rules that have attempted to address the appropriate regulation of storm water runoff. Each rule has been the focus of substantial controversy.

Following the enactment of the CWA in 1972, EPA promulgated NPDES permit regulations exempting uncontaminated storm water discharges from regulation on the basis of administrative infeasibility. These regulations were challenged and set aside in *NRDC v. Costle,* 568 F.2d 1369, 1377 (D.C.Cir.1977), on the ground that

---

1. The 1972 amendments to 33 U.S.C. §§ 1251–1387 are also known as the Federal Water Pollution Control Act. For a historical overview of the CWA, see *EPA v. State Water Resources Control Bd.,* 426 U.S. 200, 202–09, 96 S.Ct. 2022, 2023–26, 48 L.Ed.2d 578 (1976); *NRDC v. Train,* 510 F.2d 692, 695–97 (D.C.Cir.1975).

2. A "point source" is "any discernible, confined and discrete conveyance [such as a pipe, ditch, channel, or conduit], from which pollutants are or may be discharged." CWA § 502(14), 33 U.S.C. § 1362(14). The term "pollutant" encompasses a long list of substances, including industrial, municipal, and agricultural wastes. CWA § 502(6), 33 U.S.C. § 1362(6).

3. NPDES permits commonly contain numerical limits on the amounts of specified pollutants that may be discharged. *See Rybachek,* 904 F.2d at 1283. These limits may be in the form of "effluent limitations" which implement both technology-based and water quality-based requirements of the Act. *See, e.g.,* CWA §§ 301–307, 33 U.S.C. §§ 1311–1317; CWA § 502(11), 33 U.S.C. § 1362(11). When EPA has not yet issued national effluent guidelines for a category of point sources, the Agency is authorized under CWA § 402(a)(1), 33 U.S.C. § 1342(a)(1), to develop such limitations in an NPDES permit on a case-by-case basis. *NRDC v. Costle,* 568 F.2d 1369, 1378–79 (D.C.Cir.1977).

EPA could not exempt categories of point sources from the statute's permitting requirements. Following this decision, EPA issued proposed and final rules covering storm water discharges in 1980, 1982, 1984, 1985 and 1988. These rules were challenged at the administrative level and in the courts.

In 1987, Congress passed the Water Quality Act[4] ("WQA") amendments to the CWA, setting explicit and firm deadlines for EPA regulation of storm water discharges. Section 402(p) of the Act establishes a moratorium until October 1, 1992 on permits for storm water discharges, with five exceptions including an exception for "discharge[s] associated with industrial activity." CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B). Section 402(p) also outlines an incremental, or "phase-in" approach to issuance of storm water discharge permits. The purpose of this approach was "to allow EPA ... to focus [its] attention on the most serious problems." 133 Cong.Rec. 991 (1987) (statement of Rep. Stangeland). Section 402(p) required EPA to promulgate rules regulating permit application procedures in a staggered fashion.

In response to the 1987 amendments, EPA published its proposed storm water rule on December 7, 1988. National Pollutant Discharge Elimination System Permit Application Regulations for Storm Water Discharges, 53 Fed.Reg. 49,416 (1988). After extensive public comment, EPA issued the final rule on November 16, 1990. 55 Fed.Reg. 47,990.

EPA's final storm water rule defines "discharge[s] associated with industrial activity" to include contaminated discharges from both active and inactive mines. EPA excluded from the category, however, discharges from inactive coal mines reclaimed under the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C.A. §§ 1201–1328 (West 1986 & Supp.1991), and from inactive non-coal mines reclaimed under applicable federal or state laws after the rule's effective date. 55 Fed.Reg. at 48,033, 48,065–66. As a result of this ex-

clusion, such point source discharges are not required to obtain NPDES permits until after the expiration of the storm water permit moratorium.

## II

## DISCUSSION

### A. *Threshold Issues*

We have jurisdiction under section 509(b)(1)(F) of the CWA, 33 U.S.C. § 1369(b)(1)(F), which allows us to review the regulations governing the issuance of permits under section 402, 33 U.S.C. § 1342, as well as the issuance or denial of a particular permit. *NRDC v. EPA*, 656 F.2d 768, 775 (D.C.Cir.1981); *cf. E.I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 136, 97 S.Ct. 965, 979, 51 L.Ed.2d 204 (1977) (review of regulations issued under CWA § 301).

■ Petitioners have standing to challenge EPA's storm water discharge rule under CWA section 509(b)(1), 33 U.S.C. § 1369(b)(1), which permits any "interested person" to seek review of designated actions of the EPA Administrator. AMC and the other petitioners are national trade associations representing the interests of the mining industry. Many of their members own inactive mines which are required to apply for permits under EPA's storm water rule. They suffer adverse effects to their economic interests and thus are "interested persons" under section 509(b)(1). *See Trustees for Alaska v. EPA*, 749 F.2d 549, 554 (9th Cir.1984).

### B. *Standard of Review*

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (1988), governs our review of EPA's storm water rule. We "set aside agency action, findings, and conclusions" if we find them to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "without observance of procedure required by law." *Id.* § 706. Our

---

**4.** Pub.L. No. 100–4, 101 Stat. 7 (1987) (codified as amended in scattered sections of 33 U.S.C.).

function is "to determine whether [EPA] 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.'" *Rybachek*, 904 F.2d at 1284 (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)).

■ In reviewing EPA's construction of the CWA, we must determine "'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Wyckoff Co. v. EPA*, 796 F.2d 1197, 1200 (9th Cir.1986) (quoting *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). Accordingly, we must not defer to an agency interpretation that alters the clearly expressed intent of Congress. *Dole v. United Steelworkers of America*, 494 U.S. 26, 42–43, 110 S.Ct. 929, 938–39, 108 L.Ed.2d 23 (1990).

If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782; *Wyckoff*, 796 F.2d at 1200. If EPA's interpretation of the CWA is "reasonable, '[w]e must defer to the agency's interpretacion even if the agency could also have reached another reasonable interpretation....'" *Wyckoff*, 796 F.2d at 1200 (quoting *Washington v. EPA*, 752 F.2d 1465, 1469 (9th Cir.1985)). *See also Arkansas v. Oklahoma*, — U.S. —, 112 S.Ct. 1046, 1056–57, 117 L.Ed.2d 239 (1992).

## C. *Statutory Interpretation*

■ Section 402(p)(2)(B) of the CWA, 33 U.S.C. § 1342(p)(2)(B), authorizes EPA to require a permit for any storm water discharge "associated with industrial activity." AMC contends that EPA's regulation of discharges from inactive mines under this section contravenes Congress' intent.

AMC argues that the plain language of the statute authorizes EPA to regulate only discharges from "industrial activity." Since no "activity" occurs at an inactive mine, AMC reasons, the statute prohibits EPA from requiring permits for discharges from such mines.

AMC's reading of the statute ignores a significant part of the language at issue. Section 402(p)(1)(B) allows EPA to require a permit for "[a] discharge *associated with* industrial activity." (Emphasis added.) Congress did not stipulate that the activity must occur concurrently with the discharge of storm water. EPA has determined that discharges from areas of past industrial activity at a variety of facilities, including mines, may be "associated with" that industrial activity. *See* 40 C.F.R. § 122.-26(b)(14) (definition of "discharge associated with industrial activity" includes discharges from "areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water"). This conclusion is consistent with the language of the statute.[5]

AMC also looks to the terms of CWA § 402(*l*), which states that "[t]he Administrator shall not require a permit ... for discharges of stormwater runoff from *mining operations* ... composed entirely of flows ... which are not contaminated by contact with" polluting materials. (Emphasis added.) AMC argues that "operations" are by definition ongoing, and that the use of the term "operations" in this section demonstrates Congress' intent, throughout the WQA, to regulate only present activities. Section 402(*l*) does not support AMC's argument. The section does not make the term "discharge associated with industrial activity" in § 402(p) any less ambiguous. Even accepting AMC's argument that "operations" must be currently active, this exemption does not necessarily imply that only active operations were to be regu-

---

5. Since AMC does not object to EPA's regulation of active mines under this section, presumably it concedes that mining is an industrial activity.

lated under § 402(p) or any other provisions of the CWA.

In reviewing EPA's storm water rule, we must also examine the legislative history to determine whether Congress expressed a clear intent. *See NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 420, 98 L.Ed.2d 429 (1987). We find that Congress left it up to EPA to define a "discharge associated with industrial activity," specifying only that the term refers to discharges "directly related to manufacturing, processing or raw materials storage areas at an industrial plant" and not to "discharges associated with parking lots and administrative and employee buildings." 132 Cong.Rec. 31,968 (1986); 133 Cong.Rec. 985 (1987).

AMC argues that nothing in the legislative history reflects a Congressional intent to impose permitting requirements on inactive mines. Regardless of whether this is true, principles of statutory construction require AMC to demonstrate not simply that Congress failed to address the issue, but that Congress, if it had addressed the issue, would not have sanctioned EPA's interpretation. *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783. If Congress has failed to address the issue, or if the statute is silent or ambiguous, we must defer to EPA's reasonable interpretation of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781; *Wyckoff,* 796 F.2d at 1200.

We find nothing in AMC's citations to the legislative history to suggest that Congress would not have allowed EPA to require permits for inactive mines. AMC directs us to references in which Congress discussed the regulation of storm water runoff in the context of active mines, without mentioning inactive mines. AMC first examines section 402(*l*)(2), 33 U.S.C. § 1342(*l*)(2), which states that *uncontaminated* storm water discharges from mining operations are exempt from permitting. Although Congress discussed this section in the context of active mines, the legislative history provides no indication that Congress intended to exempt contaminated discharges from inactive mines.

AMC also examines CWA section 301(p), 33 U.S.C. § 1311(p), which relaxes, under limited circumstances, the applicable effluent limitations with respect to pH, iron, and manganese for discharges from coal remining at inactive sites. The section merely relaxes specific effluent limitations for certain permits when they are issued; it does not exempt any site from the requirement to obtain a permit. The Congressional discussions of this section say nothing about CWA section 402(p)(2)(B).

AMC cites statements made during the floor debate in the House to the effect that the new provisions would "reduce the universe of permits required for stormwater from millions to thousands." These statements, however, referred specifically to discharges from municipal storm sewers, *not* discharges associated with industrial activity. *See* 132 Cong.Rec. 31,964 (statement of Rep. Snyder); *id.* at 31,968 (statement of Rep. Rowland). These statements do not support AMC's claim that Congress intended to regulate only a small number of sources under the industrial activity provision.

Since CWA section 402(p)(2)(B) and its legislative history are silent regarding whether storm water discharges from inactive mines fall within the definition of "[a] discharge associated with industrial activity," we must uphold EPA's interpretation so long as it is "reasonable." *Wyckoff,* 796 F.2d at 1200.

We conclude that EPA's regulation meets the reasonableness standard. EPA noted that some mine sites represent a significant source of contaminated storm water runoff. 55 Fed.Reg. at 48,033. This finding is well documented, *see, e.g.,* 46 Fed.Reg. 3,136, 3,144 (1981), and AMC has not challenged it. Moreover, EPA has exempted from the permitting requirement mine sites where storm water does not come into contact with any overburden, raw material, byproduct, or waste product. 40 C.F.R. § 122.26(b)(14)(iii). This exemption narrows EPA's regulation of inactive mines to only those sites at which storm water discharge is likely to have become

contaminated through association with industrial activity.

EPA's interpretation is also consistent with the overall goals of the statute. Congress intended to allow EPA to adopt an orderly permitting process that would address the major contributors of pollutants, including industrial discharges, first. 133 Cong.Rec. 991 (1987) (statement of Rep. Stangeland). Since inactive as well as active mines may be significant sources of pollutants, their inclusion in the first phase is consistent with Congress' intent.

In sum, we hold that EPA's regulation of inactive mines under CWA section 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B), is consistent with the plain language and legislative history of the statute and is reasonable.

### D. *The Abandoned Mine Lands Program*

Congress established the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C.A. §§ 1201–1328 (West 1986 & Supp.1991), to address the problem of environmental damage caused by surface coal mining. *See* 30 U.S.C. § 1202(a). SMCRA regulates surface coal mines that have been active since August 3, 1977, the date of SMCRA's enactment. *Id.* § 1252. SMCRA also established the Abandoned Mine Lands ("AML") program to finance the cleanup and remediation of pre-SMCRA coal mines. *Id.* §§ 1231–1243.

### 1. *Consistency with SMCRA*

■ AMC contends that EPA ignored SMCRA's AML program in promulgating its storm water rule, and that therefore the rule is arbitrary and capricious. We disagree.

AMC notes that Congress established the AML program to reclaim resources adversely affected by past coal mining activities, and recently amended the program to include mechanisms for applying AML funds to non-coal mine sites as well.[6] Pub.L. No. 101–508, § 6010(2), 104 Stat. 1388–296 to 1388–297 (1990) (codified at 30

U.S.C. § 1240a). From these facts, AMC concludes that Congress intended to address pollution from inactive mines solely under the AML program.

■ We find nothing, in either the statute's language or its legislative history, to support such a leap in logic. To the contrary, the plain language of SMCRA reads: "Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing ... [the CWA], the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality." 30 U.S.C. § 1292(a). *See also Consolidation Coal Co. v. Costle*, 604 F.2d 239, 252 (4th Cir.1979) (SMCRA "does not supersede or modify the [CWA]"), *rev'd on other grounds*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980). According to this statutory language, the existence of SMCRA's AML program does not limit EPA's authority to regulate mine discharges under the CWA.

The AML program set up a fund, consisting of fees assessed against the coal mining industry, to be used for reclamation of certain abandoned coal mines. AMC asserts that more than $3 billion has been paid into the fund since its creation. However, at the time of SMCRA's enactment Congress indicated that the expected cost of rehabilitating abandoned coal mine sites was $7 to $10 billion. H.R.Rep. No. 218, 95th Cong., 1st Sess. at 135, *reprinted in* 1977 U.S.C.C.A.N. 593, 667. This cost has certainly increased in the fifteen years since SMCRA's enactment, as numerous mines ostensibly subject to SMCRA's reclamation requirements have nonetheless been abandoned. *See* Lily Whiteman, *Recent Efforts to Stop Abuse of SMCRA: Have They Gone Far Enough?*, 20 Envtl.L. 167, 169 (1990) (asserting that at least 6,000 mines have been abandoned in violation of SMCRA). While the AML program was enacted "in order to help correct" the environmental problems caused by past coal mining, H.R.Rep. No. 218, *supra*, at 136, nothing in its legislative history suggests

---

**6.** We note that non-coal mining sites are eligible for AML-funded reclamation only after all eligible coal mining sites in the state have been reclaimed. *See* 30 U.S.C. § 1240a(b).

that it was intended as the exclusive means of addressing these problems.

Obviously, actual reclamation of sites under the program should ameliorate any water pollution problems. It should also lead to the exemption of these sites from the permit requirement, since presumably after remediation storm water discharges would no longer contact the remnants of mining activity.

Prior to actual reclamation, however, the AML program does nothing to regulate the discharge of pollutants from abandoned mine lands. Owners of abandoned mines are not required to apply for permits under the AML, nor does the AML limit discharges from such mines. Thus, there is no reason to suppose that the AML in fact serves the same purpose as the storm water rule, making EPA's regulation unnecessary. Nor is there any inconsistency between the obligations of mine owners under the AML and the storm water rule. In sum, EPA's storm water regulation does not offend any Congressional intent to regulate abandoned mines exclusively through the AML program.

Furthermore, other provisions of the CWA also contradict AMC's conclusion that Congress intended the AML program to be the exclusive vehicle to address runoff from inactive mines. The NPDES permit program of the CWA, see CWA §§ 301(a), 402(a), 33 U.S.C. §§ 1311(a), 1342(a), regulates point source discharges of pollutants from inactive mines regardless of whether EPA classifies such discharges as "associated with industrial activity" under CWA § 402(p)(2)(B), 33 U.S.C. § 1342(p)(2)(B). Nothing in the language or legislative history of the AML program or SMCRA indicates a Congressional intent to exempt inactive mines from the NPDES permit requirement.

Finally, we find no evidence that EPA's storm water rule duplicates, varies or frustrates the goals or administration of SMCRA. The rule is fully consistent with EPA's obligation to cooperate with the Secretary of the Interior in carrying out the provisions of SMCRA. See 30 U.S.C. § 1292(b). Hence, we conclude that EPA

did not arbitrarily promulgate its storm water rule in conflict with SMCRA.

### 2. Consistency with EPA's past practice

We also reject AMC's contention that the regulation of inactive mines contradicts EPA's past practice and is therefore arbitrary and capricious. AMC notes that in prior rule-makings to set effluent limitation guidelines for mining discharges, EPA has established guidelines only for active mining areas. See 40 C.F.R. §§ 434.-10, 434.11(b), 440.132(g) (1991). However, this observation does not support AMC's contention. AMC confuses the operation of an effluent guideline with the more general requirement to obtain a permit.

Effluent limitation guidelines establish uniform national standards for the technology-based limits required in each NPDES permit. CWA § 304(b), 33 U.S.C. § 1314(b). EPA's decision not to promulgate effluent guidelines for a category of sources does not mean that those sources are exempt from permitting requirements. All point sources that discharge pollutants, including point sources that discharge pollutants from inactive mines, require a permit. EPA's decision not to establish a guideline for discharges from inactive mines means only that permits for such discharges are issued on an individual basis. See Coal Mining Point Source Category; Effluent Limitations Guidelines and New Source Performance Standards, 50 Fed.Reg. 41,296, 41,298 (1985) (sites reclaimed under SMCRA are subject to NPDES requirements, although not to the general effluent limitation guidelines). Thus, EPA's classification of discharges from inactive mines as "associated with industrial activity" is consistent with its earlier practice, in which such mines were also subject to NPDES permit requirements.

### E. Exemption of Reclaimed Mines

EPA's storm water rule excludes from the definition of "associated with industrial activity" those discharges from inactive mines that have been reclaimed under

SMCRA or equivalent federal or state laws for non-coal mines. 40 C.F.R. § 122.-26(b)(14)(iii). In the statement accompanying the final rule, EPA stated that it excluded these discharges because, "as a general matter, areas which have undergone reclamation pursuant to such laws have concluded all industrial activity in such a way as to minimize contact with overburden, mine products, etc." 55 Fed.Reg. at 48,033 (1990). EPA stated that it lacked sufficient evidence to conclude that reclamation under earlier laws would effectively prevent the discharge of contaminated storm water. *Id.* Hence, EPA classified discharges from such mines as "associated with industrial activity." *Id.* AMC challenges this classification.[7]

1. *Mines reclaimed under SMCRA's "Interim Program"*

■ AMC approves of EPA's decision to exempt from NPDES permit requirements coal mines that have completed reclamation under the final SMCRA program, and asserts that EPA should have gone further. AMC argues that EPA arbitrarily failed to exempt coal mining sites reclaimed under SMCRA's "interim program."

SMCRA "establish[ed] a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). The statute, which regulates mining and post-mining operations, established a two-tiered program, consisting of an interim, or initial, regulatory program, and a permanent regulatory program. 30 U.S.C. § 1251; *see id.* §§ 1252(b), 1252(c), 1265. The program's requirements affect the likelihood that discharges from re-

claimed mines will contain significant levels of pollutants. For example, the final SMCRA program requires five to ten years of post-reclamation care, 30 U.S.C. § 1265(b)(20), while the interim program required none, *see* 30 U.S.C. § 1252(c) (no requirement of compliance with 30 U.S.C. § 1265(b)(20)). The final SMCRA program also requires the posting of a performance bond. 30 C.F.R. § 800.11 (1991). Release of this bond indicates that the regulatory authority is satisfied that reclamation is complete and the site is no longer likely to produce contaminated runoff. *See* Bond and Insurance Requirements for Surface Coal Mining and Reclamation Operations Under Regulatory Programs, 30 C.F.R. § 800.40 (1991); 46 Fed.Reg. at 3,145.

In light of the differences between the interim and final SMCRA programs. EPA acted reasonably in exempting only mines reclaimed under the final program. EPA's decision was neither arbitrary nor capricious.

2. *Mines reclaimed under pre–SMCRA state laws*

■ AMC also contends that EPA arbitrarily failed to exempt discharges from coal mines reclaimed under pre-SMCRA state laws. We disagree. Congress enacted SMCRA in large part because existing state laws were not effectively addressing environmental damage caused by mining. *See* H.R.Rep. No. 218, 95th Cong., 1st Sess. 58, *reprinted in* 1977 U.S.C.C.A.N. 593, 596 ("[D]espite claims from some quarters that State reclamation laws have improved so significantly that Federal mining standards are no longer needed, the hearing

---

7. EPA argues that we should decline to hear AMC's objection because AMC failed to exhaust its administrative remedies. EPA contends that it received no public comments suggesting that discharges from inactive mines reclaimed under programs other than SMCRA should be excluded from the definition of "associated with industrial activity." This argument lacks merit.

EPA did receive comments raising the issue of the regulation of inactive mines, including reclaimed mines. *See* Letter from John E. Hardaway, Colorado Mining Ass'n, to Tom Seaton, Environmental Protection Agency 1, 7 (March 3, 1989) (Petitioner's Excerpts of Record at 211,

217). Furthermore, AMC was not required to raise every issue with a degree of specificity that would have required it to be psychic. *See City of Seabrook v. EPA*, 659 F.2d 1349, 1361 (5th Cir.1981). EPA's proposed rule did not make the exemption for reclaimed coal mines dependent on release of a SMCRA bond, nor did it establish any exemption for reclaimed non-coal mines. *See* 53 Fed.Reg. at 49,468 (proposed 40 C.F.R. § 122.26(b)(14)). AMC can hardly be faulted for its failure to submit comments on provisions that did not appear in the proposed rule.

record abounds with evidence that this is simply not the case. For a variety of reasons, including the reluctance of the State to impose stringent controls on its own industry, serious abuses continue."); *id.* at 129, 1977 U.S.C.C.A.N. at 661 (state enforcement of reclamation programs has "often fallen short of the vigor necessary to assure adequate protection of the environment.... [T]he implementation of minimal Federal standards ... will ... greatly increase the effectiveness of State enforcement programs operating under [SMCRA]."). Hence, we find that EPA acted reasonably in determining that mines reclaimed under such laws should not be exempt from NPDES permit requirements. *See Chemical Mfrs. Ass'n. v. U.S.E.P.A.,* 870 F.2d 177, 199 (5th Cir.1989); *Rybachek,* 904 F.2d at 1284.

### 3. *Reclaimed non-coal mines*

██ EPA's storm water rule exempts from the definition of "associated with industrial activity" non-coal mines reclaimed under federal or state laws similar to SMCRA. Because sites reclaimed under older laws might continue to discharge contaminated storm water, EPA limited the exemption to mines released from reclamation requirements on or after the rule's effective date. 55 Fed.Reg. at 48,033. AMC contends that this limitation was arbitrary and capricious.

AMC does not contest EPA's concern with the effectiveness of older laws. Rather, AMC argues that EPA acted arbitrarily in limiting the exemption to mines reclaimed after the rule's effective date. We disagree. AMC bases its argument on the fact that "a hypothetical gold mine that was properly closed in Nevada on December 18, 1990 is exempt from stormwater permitting, but an identical gold mine that was closed and reclaimed two days earlier, on December 16, 1990, is not." But this analysis applies to any deadline or effective date. Short of determining each exemption on an individual basis, EPA had no choice but to establish a cutoff date for operation of the rule. Furthermore, because the laws governing non-coal mine reclamation have evolved over the years, attempting to determine the precise regulations that governed the reclamation of a particular mine and whether those regulations were sufficiently stringent would create an enormous administrative burden. EPA's limitation of the exemption for reclaimed non-coal mines was certainly reasonable. *See Chemical Mfrs.,* 870 F.2d at 199; *Rybachek,* 904 F.2d at 1284.

### F. *Retroactivity*

██ AMC argues, next, that EPA's rule requiring permits for discharges from inactive mines unlawfully imposes retroactive liability on owners and operators of those mines.

██ Agencies generally do not have the authority to issue rules having retroactive effect in the absence of an express Congressional grant of such authority. *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). A rule has retroactive effect if "an act lawful at the time it was done" is "rendered unlawful and the actor called to account for a completed, now-condemned deed in the halls of justice." *Ralis v. RFE/RL, Inc.,* 770 F.2d 1121, 1127 (D.C.Cir.1985). In other words, a retroactive rule is one that alters the *past* legal consequences of past actions. *Bowen,* 488 U.S. at 219, 109 S.Ct. at 477 (Scalia, J., concurring).

EPA's storm water rule requires only that owners or operators apply for permits for future discharges from inactive mines. Although the rule may reduce the financial attractiveness of mine ownership, it does not impose liability for past conduct.

AMC argues that EPA's storm water discharge rule is impermissible because it imposes liability on owners of mines where mining activities were conducted only in the past. We disagree. AMC ignores the distinction between merely "affecting rights" and "retroactively imparting an obligation *cum* liability." *Ralis,* 770 F.2d at 1127. A rule with exclusively future effect, such as a change in the tax laws taxing future income from existing trusts, is not made retroactive by the fact that it

will "unquestionably *affect* past transactions (rendering [ ] previously established trusts less desirable in the future)." *Bowen*, 488 U.S. at 219–20, 109 S.Ct. at 477 (Scalia, J., concurring).

EPA's rule does not penalize inactive mine owners for mining activities or contaminated discharges that occurred in the past; it regulates discharges of contaminated storm water that occur in the future.[8] The fact that the present contamination is the result of past mining activities does not make EPA's rule retroactive.

The rule may frustrate the economic expectations of some inactive mine owners, who may need to install treatment systems or implement storm water management practices in order to comply with the permit requirements. But regulations are not retroactive merely because they require a change in existing practices. Moreover, the rule effectuates Congress' intent to require dischargers to minimize or eliminate discharges of pollutants *so as to* achieve the water quality goals of the Act. CWA §§ 101(a), 301(a), 402(a), 33 U.S.C. § 1251(a), 1311(a), 1342(a). We hold, therefore, that EPA's storm water rule does not impose retroactive liability on owners of inactive mines.

### G. *Notice and Comment*

 AMC contends that EPA's decision to include inactive mines in its storm water permit requirements violates the "notice and comment" provisions of the APA, 5 U.S.C. § 553(b), (c). The APA requires "that notice of proposed rulemaking shall be published in the Federal Register, that after notice the agency give interested persons an opportunity to participate in the rulemaking through appropriate submissions, and that after consideration of the record so made the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."

*United States v. Allegheny–Ludlum Steel Corp.*, 406 U.S. 742, 758, 92 S.Ct. 1941, 1951, 32 L.Ed.2d 453 (1972).

To satisfy the notice requirement of the APA, the rulemaking agency must publish "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553. "The notice should be sufficiently descriptive of the 'subjects and issues involved' so that interested parties may offer informed criticism and comments." *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 48 (D.C.Cir.1976).

EPA's decision to regulate discharges from inactive mines under the final storm water rule matches the proposed rule almost identically, and both rules plainly refer to inactive mines. The proposed rule, published in the Federal Register, included "[f]acilities classified as Standard Industrial Classifications 10 through 14 (mineral industry) including active or inactive mining operations" as discharges associated with industrial activity. 53 Fed.Reg. at 49,468 (proposed rule). The final rule contains the same language; the only differences between the proposed and final rules are irrelevant to the "notice and comment" issue. 55 Fed.Reg. at 48,065. Furthermore, EPA specifically requested—and received—comments on "the scope of the definition [of 'industrial activity'] (types of facilities addressed) as well as the clarity of the regulation." 53 Fed.Reg. at 49,431. Hence, we find that EPA satisfied the notice requirement of the APA.

In spite of the plain reference to inactive mines in the proposed rule and accompanying preamble, AMC insists that it lacked adequate notice of the substance of EPA's rule. AMC's persistence on this point seems disingenuous in light of its next argument, that EPA ignored the many comments it received urging it not to regulate inactive mines.

---

**8.** The rule specifies that operators of inactive mine sites that discharge contaminated storm water must apply for an NPDES storm water permit by September 30, 1991 for group applicants, and by November 18, 1991 for individual applicants. 55 Fed.Reg. at 48,071–72; 56 Fed. Reg. at 12,098. Compliance with the terms of any permit issued pursuant to the application will be required no later than three years after the date of issuance. CWA § 402(p)(4)(A), 33 U.S.C. § 1342(p)(4)(A). Thus, only future discharges will be subject to NPDES requirements as a result of EPA's rule.

AMC argues that EPA failed to consider and respond to comments regarding the number of inactive mines. However, an agency need only respond to "significant" comments, *i.e.*, those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule. *Home Box Office v. FCC*, 567 F.2d 9, 35 & n. 58 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). The failure to respond to comments is grounds for reversal only if it reveals that the agency's decision was not based on consideration of the relevant factors. *Thompson v. Clark*, 741 F.2d 401, 409 (D.C.Cir.1984). The number of inactive mines was irrelevant to EPA's rule; the relevant point was whether or not discharges from those mines were likely to be contaminated. None of the comments AMC complains were not answered suggested that inactive mines were not a significant source of pollution.

AMC further contends that EPA failed to respond to comments suggesting that abandoned mines should be distinguished from inactive mines because abandoned mines are covered under the Abandoned Mine Lands program of SMCRA. The comment at issue did not in fact squarely raise this point. Moreover, as explained above, the AML program clearly is not an exhaustive mechanism for addressing the problems of polluted runoff from abandoned mines. Thus, EPA's failure to address this issue directly in its final rule did not violate the EPA.

### H. *Regulatory Flexibility Analysis*

In the proposed and final storm water rules, EPA certified, pursuant to the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601–612 (1988), that the rule would not have "a significant economic impact on a substantial number of small entities." *Id.*

§ 605; 55 Fed.Reg. at 48,061; 53 Fed.Reg. at 49,464. Certification releases the agency from its obligation to conduct a "regulatory flexibility analysis" in conjunction with its rulemaking. 5 U.S.C.A. § 605(b).[9]

AMC contends that EPA's certification was mistaken with respect to the regulation of inactive mines, and urges us to invalidate the regulation as arbitrary and capricious. We cannot do so. We lack the authority to strike down the storm water rule on the basis of a flawed certification.

The RFA expressly prohibits judicial review of EPA's certification:

(a) Except as otherwise provided in subsection (b), any determination by an agency concerning the applicability of any of the provisions of this chapter to any action of the agency shall not be subject to judicial review.

(b) Any regulatory flexibility analysis prepared under sections 603 and 604 of this title and the compliance or non-compliance of the agency with the provisions of this chapter shall not be subject to judicial review. When an action for judicial review of a rule is instituted, any regulatory flexibility analysis for such rule shall constitute part of the whole record of agency action in connection with the review.

5 U.S.C. § 611.

EPA's certification pursuant to 5 U.S.C. § 605(b) that no regulatory flexibility analysis was necessary constitutes a "determination by an agency concerning the applicability of any of the provisions of" the RFA, and is therefore unreviewable. 5 U.S.C. § 611(a); *see Thompson v. Clark*, 741 F.2d 401, 404–05 (D.C.Cir.1984); *Small Refiner Lead Phase–Down Task Force v. U.S. E.P.A.*, 705 F.2d 506, 537 (D.C.Cir. 1983).[10]

**9.** A final regulatory flexibility analysis must contain a statement of the need for and objectives of the rule, a discussion of the issues raised by public comments on the initial regulatory flexibility analysis, and an analysis of significant alternatives that would minimize any significant economic impact of the rule on small entities. 5 U.S.C. § 604(a).

**10.** In arguing that we have the authority to review EPA's certification, AMC misreads the RFA. The RFA provides that *if* an agency prepares a regulatory flexibility analysis, the analysis becomes part of the record of agency action and should be considered in assessing the validity of the underlying rule. 5 U.S.C. § 611(b); *Thompson*, 741 F.2d at 405; *Small Refiner*, 705

AMC also contends that, even if actual compliance with the RFA is not reviewable, EPA's failure to understand the administrative and economic burdens created by its rule makes the rule arbitrary and capricious. AMC correctly points out that an administrative action is arbitrary and capricious if the agency has failed to consider relevant factors. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). It does appear that EPA failed to understand the number of inactive mines covered by its rule. We decline to invalidate the rule on this ground, however, because we conclude that EPA was not required to consider economic and administrative impacts in formulating this rule.

The CWA requires EPA to regulate, through the issuance of NPDES permits, all discharges of pollutants to the nation's waters. CWA § 402; *NRDC v. Costle*, 568 F.2d 1369 (D.C.Cir.1977). In the WQA, Congress provided a temporary exemption for some sources of storm water discharge, but not for discharges associated with industrial activity. The legislative history suggests that Congress wanted to limit administrative burdens on municipal regulatees, but contains no such suggestion with respect to industrial dischargers. Thus, if discharges from inactive mines fall within the category of discharges associated with industrial activity (as EPA reasonably concluded they do), EPA could not exempt inactive mines from the permitting requirement on the basis of heavy administrative burdens or heavy burdens on the owners of such mines. *See NRDC v. Costle*, 568 F.2d 1369, 1377 (D.C.Cir.1977) (EPA does not have the authority to exempt classes of dischargers from CWA's permit requirement). Economic and administrative burdens are properly considered in determining permit conditions, not in deciding which facilities must obtain a permit. *Cf. EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268

(1980) (explaining when EPA can properly consider economic impact in setting effluent limitations).

## III

## CONCLUSION

EPA's rule including storm water discharges from inactive mines within the definition of discharges "associated with industrial activity" is consistent with Congressional intent, and is not arbitrary and capricious. The petition for review is DENIED.

---

F.2d at 537. In the present case, since EPA certified that it need not conduct a regulatory flexibility analysis, this provision does not apply.

