United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 5, 1999 Decided June 16, 2000 

 No. 98-1526

 Allied Local and Regional Manufacturers Caucus, et al., 
 Petitioners

 v.

 U.S. Environmental Protection Agency, 
 Respondent

 National Paint & Coatings Association, et al., 
 Intervenors

 Consolidated with
 98-1527

 On Petitions for Review of Orders of the 
 Environmental Protection Agency

 C. Boyden Gray argued the cause for petitioner Dunn-
Edwards Corporation. With him on the briefs were James 

R. Wrathall and IJay Palansky. Daniel H. Squire entered 
an appearance.

 William M. Smiland argued the cause for petitioners 
Allied Local and Regional Manufacturers Caucus, et al. With 
him on the briefs were Christopher G. Foster and Albert M. 
Cohen.

 Scott J. Jordan, Attorney, U.S. Department of Justice, 
argued the cause for respondent. With him on the brief were 
Lois J. Schiffer, Assistant Attorney General, and Geoffrey L. 
Wilcox, Attorney, U.S. Environmental Protection Agency. 
Eric G. Hostetler, Attorney, U.S. Department of Justice, 
entered an appearance.

 Nancy S. Bryson, Richard J. Mannix, Robert L. Rhodes 
and Rena I. Steinzor were on the brief for intervenors. 
Thomas J. Graves entered an appearance.

 Before: Ginsburg, Tatel, and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Garland.

 Garland, Circuit Judge: Petitioners in these consolidated 
cases challenge final regulations promulgated by the Environ-
mental Protection Agency (EPA) to limit the content of 
volatile organic compounds in architectural coatings, including 
paints. The regulations were issued pursuant to section 
183(e) of the Clean Air Act, which directs the agency to 
regulate emissions from consumer and commercial products 
to help achieve the national ambient air quality standard for 
ozone. Petitioners are Dunn-Edwards Corporation, a large 
paint manufacturer, and Allied Local and Regional Manufac-
turers Caucus, an association of manufacturers and distribu-
tors of architectural coatings. Intervening on EPA's side are 
other industry groups--including the National Paint & Coat-
ings Association, a trade association of some 400 paint and 
coatings manufacturers and distributors--which urge us to 
uphold the regulations.

 Petitioners challenge the regulations on a multitude of 
grounds, including their asserted inconsistency with the Clean 
Air Act, the Regulatory Flexibility Act, the Unfunded Man-
dates Reform Act, and the Commerce Clause. We conclude 

that EPA's regulations are lawful and deny the petitions for 
review.

 I

 The Clean Air Act, 42 U.S.C. ss 7401 et seq., directs EPA 
to establish national ambient air quality standards for harm-
ful air pollutants. See 42 U.S.C. s 7408(a). One of the 
pollutants so identified and regulated by the agency is 
ground-level ozone. See 40 C.F.R. s 50.9. Although in the 
upper atmosphere ozone occurs naturally and forms a protec-
tive layer that shields human beings from the harmful effects 
of the sun's ultraviolet rays, at ground level, man-made ozone 
can have a wide array of negative effects on human health, 
crops, and forests.1 See EPA, Study of Volatile Organic 
Compound Emissions From Consumer and Commercial Prod-
ucts, Report to Congress 1-1 (1995) (J.A. at 518) [hereinafter 
Report].

 Section 183(e) of the Clean Air Act, added as part of the 
1990 amendments to that Act, is aimed at mitigating the 
problem of ground-level ozone. See Clean Air Act Amend-

__________
 1 Reporting on the Clean Air Act Amendments of 1990, the 
Senate Environment and Public Works Committee explained the 
impact of ground-level ozone on human health:

 Ozone is fatal at high concentrations. At lower concentrations 
 found in many urban areas in the United States, extensive 
 research has shown that healthy adults and children begin to 
 exhibit adverse health effects. These include chest pains, 
 shortness of breath, coughing, nausea, throat irritation, and 
 increased susceptibility to respiratory infections.
 
 Potentially more troubling and less well understood are the 
 effects of long-term chronic exposure to summertime ozone 
 concentrations found in many cities. Regular out-of-doors work 
 or play during the hot, sunny summer months in the more 
 polluted cities may cause biochemical and structural changes in 
 the lung, paving the way for chronic respiratory diseases.
 
S. Rep. No. 101-228, at 6 (1989); see also Consumer and Commer-
cial Products: Schedule for Regulation, Final Listing, 63 Fed. Reg. 
48,792, 48,793 (1998).

ments of 1990, Pub. L. No. 101-549, s 183(e), 104 Stat. 2399, 
2444-47 (codified at 42 U.S.C. s 7511b(e)). Ozone is formed 
when nitrogen oxides (NOx) react with volatile organic com-
pounds (VOCs) in the presence of sunlight. See Report at 
1-1 (J.A. at 518). Section 183(e) directs EPA to regulate 
emissions of VOCs from consumer and commercial products 
in order to help states achieve the national ambient air 
quality standard (NAAQS) for ozone.2

 Section 183(e) contains a number of directions to EPA. 
First, it instructs the agency to "conduct a study of the 
emissions of volatile organic compounds into the ambient air 
from consumer and commercial products (or any combination 
thereof)" in order to "(i) determine their potential to contrib-
ute to ozone levels which violate the national ambient air 
quality standard for ozone" and "(ii) establish criteria for 
regulating consumer and commercial products." 42 U.S.C. 
s 7511b(e)(2)(A). The section further directs that the study 
be completed, and a report submitted to Congress, "not later 
than 3 years after November 15, 1990." Id.

 Upon submission of the report, section 183(e) requires the 
EPA to "list those categories of consumer or commercial 
products that [it] determines, based on the study, account for 
at least 80 percent of the VOC emissions, on a reactivity-
adjusted basis, from consumer or commercial products in 
areas that violate the NAAQS for ozone." Id. 
s 7511b(e)(3)(A). The statute then directs the agency "to 
divide the list into 4 groups establishing priorities for regula-
tion" based on the criteria developed in the study. Id. 
Finally, the statute requires the EPA to regulate one group 
every two years until all four have been regulated. See id.

 After passage of the 1990 amendments, EPA instituted a 
formal regulatory negotiation process, aimed at achieving 

__________
 2 The statute defines a "consumer or commercial product" as 
"any substance, product (including paints, coatings, and solvents), or 
article (including any container or packaging) held by any person, 
the use, consumption, storage, disposal, destruction, or decomposi-
tion of which may result in the release of volatile organic com-
pounds." 42 U.S.C. s 7511b(e)(1)(B).

consensus on the development of VOC regulations for paint 
and architectural coatings. Representatives of the affected 
industry were included on the negotiation committee. Com-
plete consensus could not be reached, however, and the 
process was terminated in 1994. See National Volatile Or-
ganic Compound Emission Standards for Architectural Coat-
ings, Final Rule, 63 Fed. Reg. 48,848, 48,850 (1998) [hereinaf-
ter Final Rule].

 In March 1995, EPA submitted its statutorily-required 
report to Congress. The report concluded that "[c]onsumer 
and commercial products, while individually small sources of 
VOC emissions, contribute significantly to the ozone nonat-
tainment problem." Report at 2-1 (J.A. at 523). VOC 
emissions from these products, the report said, constitute 
approximately 28% of all man-made VOC emissions. See id. 
at 2-8 (J.A. at 530). In compliance with Congress' direction, 
the report also set forth "criteria for regulating consumer and 
commercial products under the Act." Id. at 4-1 (J.A. at 557). 
The eight criteria listed by the agency were:

 (1) utility 
 (2) commercial demand 
 (3) health or safety functions 
 (4) emissions of 'highly reactive' compounds 
 (5) availability of alternatives 
 (6) cost-effectiveness of controls 
 (7) magnitude of annual VOC emissions 
 (8) regulatory efficiency 
 
Id. at 4-2 (J.A. at 558).3

 In March 1995, EPA also published the statutorily-
mandated list of categories of consumer or commercial prod-
ucts that together account for at least 80% of VOC emissions 
from such products in ozone nonattainment areas on a reac-
tivity-adjusted basis. See Consumer and Commercial Prod-
ucts, Notice of Product Category List and Schedule for 

__________
 3 The first six criteria were derived from five factors specified in 
the statute. See 42 U.S.C. s 7511b(e)(2)(B). The last two were 
added by the agency. See infra Part IV.E.

Regulation, 60 Fed. Reg. 15,264 (1995) [hereinafter Notice of 
Product Category List]. Per Congress' instruction, EPA 
divided those categories into four groups, establishing priori-
ties for regulation. Architectural coatings were included in 
the first group, along with certain household consumer prod-
ucts and automobile refinish coatings. EPA determined that 
these three categories account for about 30% of the VOC 
emissions from all consumer and commercial products. See 
Consumer and Commercial Products: Schedule for Regula-
tion, Final Listing, 60 Fed. Reg. 48,792, 48,793 (1998) [herein-
after Final Listing]. According to EPA, the architectural 
coatings category alone accounts for about 9% of the emis-
sions from all consumer and commercial products, making it 
"one of the largest emissions sources among the consumer 
and commercial products categories." Final Rule, 63 Fed. 
Reg. at 48,850; see National Volatile Organic Compound 
Emission Standards for Architectural Coatings, Proposed 
Rule, 61 Fed. Reg. 32,729, 32,731 (1996) [hereinafter Pro-
posed Rule]; Report at 2-6 (J.A. at 528).

 In September 1998, EPA published its final rules and 
listing. As proposed, the agency listed architectural coatings, 
along with consumer products and automobile refinish coat-
ings, in the first group of consumer and commercial product 
categories subject to regulation under section 183(e). See 
Final Listing, 63 Fed. Reg. at 48,792. At the same time, it 
issued a rule specifying limits on the permissible VOC content 
of products in each of the categories. See National Volatile 
Organic Compound Emission Standards for Automobile Coat-
ings, 63 Fed. Reg. 48,806 (1998); National Volatile Organic 
Compound Emission Standards for Consumer Products, 63 
Fed. Reg. 48,819 (1998); National Volatile Organic Compound 
Emission Standards for Architectural Coatings, 63 Fed. Reg. 
48,848 (1998).

 Petitioners Dunn-Edwards and Allied challenge EPA's ini-
tial study and report to Congress, as well as the list and rule 
that followed.4 They assert that EPA has misinterpreted the 

__________
 4 Dunn-Edwards challenges EPA's decisions only insofar as 
they relate to architectural coatings. Although Allied's brief sug-

Clean Air Act and that its regulations are arbitrary and 
capricious. By contrast, intervenor National Paint & Coat-
ings Association, which, like Allied, participated in the unsuc-
cessful attempt at regulatory negotiation, supports EPA's 
regulations, describing them as a "comprehensive set of rea-
sonable limits that are tough but fair, and which can contrib-
ute significantly to ozone emissions reductions as mandated 
by the [Act]." NPCA Br. at 2-3.

 II

 In assessing petitioners' claim that EPA has misconstrued 
the statute, we are guided by the standards set forth in 
Chevron U.S.A. Inc. v. Natural Resources Defense Council, 
Inc., 467 U.S. 837, 842-44 (1984). Under Chevron's first step, 
we ask whether Congress "has directly spoken to the precise 
question at issue," in which case we "must give effect to the 
unambiguously expressed intent of Congress." Id. at 842-43. 
If "the statute is silent or ambiguous with respect to the 
specific issue," however, we move to Chevron's second step. 
Id. at 843. Under step two, we must defer to the agency's 
interpretation so long as it is "based on a permissible con-
struction of the statute," id., and is "reasonable in light of the 
Act's text, legislative history, and purpose," Southern Cal. 
Edison Co. v. FERC, 116 F.3d 507, 511 (D.C. Cir. 1997).

 As petitioners note, we also have the power to set aside a 
final rule promulgated under the Clean Air Act if the rule is 
"arbitrary, capricious, an abuse of discretion, or otherwise not 
in accordance with law." 42 U.S.C. s 7607(d)(9)(A). To 
determine whether EPA's rules are "arbitrary and capri-
cious," we apply the same standard of review under the Clean 
Air Act as we do under the Administrative Procedure Act 
(APA), 5 U.S.C. s 706(2)(A). See Ethyl Corp. v. EPA, 51 
F.3d 1053, 1064 (D.C. Cir. 1995); Chemical Mfrs. Ass'n v. 
EPA, 28 F.3d 1259, 1263-64 (D.C. Cir. 1994). In that regard, 

__________
gested a challenge to the consumer products and automobile refin-
ish coatings rules as well, at oral argument counsel made clear that 
Allied's attack on those rules is identical to its attack on the 
architectural coatings rule. See Oral Arg. Tr. at 78-79.

we look for guidance to Motor Vehicle Manufacturers Ass'n 
v. State Farm Mutual Automobile Insurance, 463 U.S. 29, 43 
(1983). Under the standard set forth in that case, we must 
affirm the EPA's rules if the agency has considered the 
relevant factors and articulated a " 'rational connection be-
tween the facts found and the choice made.' " Id. at 43 
(quoting Burlington Truck Lines v. United States, 371 U.S. 
156, 168 (1962)).

 In the following parts, we apply these standards to petition-
ers' challenge to the architectural coatings rule and related 
EPA decisions.

 III

 Petitioners' principal argument is that the Clean Air Act 
requires EPA to regulate VOCs according to their "reactivi-
ty," and that EPA failed to do so. "Reactivity," as defined by 
petitioners, is " 'the amount of ozone formed per unit amount 
... of VOC added [to a given atmospheric mixture].' " 
Dunn-Edwards Br. at 3 n.4 (quoting National Research 
Council, Rethinking the Ozone Problem in Urban and Region-
al Air Pollution 153 (1991) (J.A. at 165)) (alterations in 
original). In petitioners' view, EPA ignored reactivity and 
instead regulated VOCs according to their "mass"--i.e., ac-
cording to the amount of VOCs contained in a product.

 In this blunt form, petitioners' attack on the EPA is 
factually incorrect. As the EPA notes, it did "consider[ ] 
reactivity in prioritizing and selecting product categories to 
be listed for regulation." Final Listing, 63 Fed. Reg. at 
48,795. It did so by using available reactivity data to divide 
VOCs into three groups: negligibly reactive, reactive, and 
highly reactive. See id.

 EPA designated as negligibly reactive those compounds the 
data showed to have insignificant ozone-forming potential. 
See id. To make that designation, EPA relied on data 
derived from the "method now normally used for identifying 
negligibly reactive VOC," the so-called "kOH method." Re-
port at 3-4 (J.A. at 549). "kOH reactivity data," the agency 
said, "have been obtained or estimated for nearly all VOC 

species of interest." Id. at 3-5 (J.A. at 550); see also id. at 3-
4 (J.A. at 549) (describing kOH method). Compounds deter-
mined to be negligibly reactive on the basis of that data were 
excluded altogether from the VOC emissions inventory and 
from the related regulations. See Final Listing, 63 Fed. Reg. 
at 48,795.5

 To differentiate between the remaining reactive VOCs, 
EPA included data derived from the "Incremental Reactivity" 
method, a method "more appropriate for rating reactive 
VOC." Report at 3-4 (J.A. at 549). EPA used this data to 
identify ten classes of VOCs that are highly reactive under 
most conditions. See Final Listing, 63 Fed. Reg. at 48,795-
96. The agency then identified the product categories known 
to contain these highly reactive compounds, and estimated the 
quantity of highly reactive compounds emitted by those prod-
uct categories. See id. at 48,796. Finally, EPA adjusted the 
mass emissions figures for those product categories by apply-
ing a reactivity adjustment factor to the mass emissions of 
their highly reactive VOCs. See id.

 Petitioners recognize that EPA did, at least in this tripar-
tite categorical form, regulate according to reactivity. Their 
contention is that this is not enough. Rather, petitioners 
urge that the statute requires EPA to determine the reactivi-
ty of each individual VOC species, and to use each VOC's 
relative reactivity in promulgating the final regulations. Peti-
tioners' argument is based on their analysis of three provi-
sions of the Clean Air Act.

 A

 Section 183(e) of the Clean Air Act directs EPA "to conduct 
a study of the emissions of volatile organic compounds into 
the ambient air from consumer and commercial products (or 
any combination thereof) in order to--(i) determine their 
potential to contribute to ozone levels which violate the 
national ambient air quality standard for ozone...." 42 

__________
 5 EPA labeled a compound negligibly reactive if its kOH value 
was lower than that of ethane. See Report at 3-5 (J.A. at 550).

U.S.C. s 7511b(e)(2)(A). Petitioners contend that the phrase 
"potential to contribute" as used in this provision is synony-
mous with the term "reactivity."

 Accepting petitioners' contention that the Clean Air Act 
requires a determination of reactivity, however, does not 
resolve the question of whether reactivity must be deter-
mined on an individual VOC-by-VOC, rather than categorical, 
basis. Allied contends that the above-quoted provision re-
quires EPA to determine the reactivity of "each" volatile 
compound. See Allied Br. at 14. Had Congress used the 
word "each" in the statute, the first step of the Chevron test 
might well dictate victory for Allied. But Congress did not 
use that word. Instead, it directed EPA to study emissions 
of volatile organic compounds "from consumer and commer-
cial products (or any combination thereof) in order to ... 
determine their potential to contribute to ozone levels." 42 
U.S.C. s 7511b(e)(2)(a) (emphasis added). The express refer-
ence to "any combination thereof," and the direction to deter-
mine "their potential" rather than "each's potential" (or even, 
"their potentials"), renders it impossible to regard the statute 
as unambiguously expressing an intent that each VOC be 
analyzed individually. To the contrary, and moving to the 
second step of the Chevron test, these references support the 
reasonableness of EPA's contention that Congress authorized 
the agency to proceed on a category-by-category basis.

 EPA's reading of the statute is further supported by the 
provision requiring EPA to complete its study and submit its 
report within three years. See id. Relatively little data is 
currently available on the comparative reactivity of individual 
VOC species. See Report at 2-10, 3-5 (J.A. at 532, 550) 
(noting that Incremental Reactivity data is only available for 
"some 328 VOC species or groups of species"). According to 
EPA's figures, not seriously contested by petitioners, a de-
tailed reactivity study of a single VOC species would take two 
months to accomplish. See EPA, Response to Comments on 
Section 183(e) Study and Report to Congress 2-75 (1998) 
(J.A. at 740) [hereinafter Response to Comments]. As "there 
are approximately 1,000 different VOC species associated 
with the architectural coating industry alone," id., EPA esti-

mates that a truly species-specific analysis of reactivities 
would require 166 years of testing. Accordingly, EPA rea-
sonably concluded that in light of the three-year statutory 
timetable, Congress could not have expected it to proceed on 
a species-specific basis.

 In reply to this argument, Dunn-Edwards suggests that 
EPA could have streamlined the task by confining its analysis 
to the smaller universe of those VOCs most commonly found 
in architectural coatings. "EPA need not," Dunn-Edwards 
says, "have determined the reactivity of every VOC." Dunn-
Edwards Reply Br. at 6. Instead, a "reactivity-based regula-
tion could be implemented using information on only the three 
VOCs accounting for almost all emissions from waterborne 
architectural coatings and the eight VOCs accounting for 
almost 80% of emissions from solventborne architectural coat-
ings." Id. at 6. Individual analyses of just those eleven, 
Dunn-Edwards argues, could readily have been completed 
within the statutory timetable.

 This reply has two problems. First, Congress directed 
EPA to study and regulate the VOC emissions from all 
"consumer or commercial products," not only from architec-
tural coatings. While the streamlined approach Dunn- 
Edwards suggests might accomplish the task for the product 
category of principal concern to petitioner, that does not 
answer EPA's contention that the agency would still have 
been unable to meet the statutory deadline across the board.

 Moreover, and more important, in making this suggestion 
Dunn-Edwards effectively abandons the purity of the argu-
ment it predicated on Chevron step one. By contending that 
EPA could have accomplished its task within the time avail-
able by studying only eleven of the VOCs contained in 
architectural coatings, Dunn-Edwards must accept that the 
statute does not require a separate evaluation of each VOC's 
individual reactivity. And if the statutory language permits 
the agency to regulate by analyzing only the eleven most 
significant VOCs, it is hard to see why it bars EPA from 
instead taking the analytical approach it preferred: excluding 
from regulation those VOCs with negligible reactivity, giving 

regulatory priority to product categories containing the ten 
classes of most highly reactive VOCs, and regulating the 
balance of reactive compounds according to the mass of their 
emissions. It may be, as petitioners contend, that theirs is 
the better approach; but that is not a question for this court. 
Under Chevron, we are bound to uphold agency interpreta-
tions as long as they are reasonable--"regardless whether 
there may be other reasonable, or even more reasonable, 
views." Serono Lab., Inc. v. Shalala, 158 F.3d 1313, 1321 
(D.C. Cir. 1998).

 Finally, Dunn-Edwards implicitly suggests that EPA was 
unfaithful to section 183(e)(2)(A) because, rather than "deter-
mine [VOCs'] potential to contribute to ozone levels" by doing 
its own testing, the agency relied on a review of the existing 
scientific literature. See Dunn-Edwards Br. at 12. But 
nothing in section 183(e) declares that the only way to "deter-
mine" potential is through the agency's own studies--some-
thing Congress did demand in other sections of the Clean Air 
Act. See, e.g., 42 U.S.C. s 7511f (directing EPA to study the 
role of ozone precursors in tropospheric ozone formation, and 
commanding that the "Administrator shall utilize all available 
information and studies, as well as develop additional infor-
mation, in conducting the study required by this section") 
(emphasis added). Nor is there anything unreasonable about 
the agency's conclusion that it could "determine" VOCs' po-
tential to contribute by examining data in the existing litera-
ture. To the contrary, "EPA typically has wide latitude in 
determining the extent of data-gathering necessary to solve a 
problem. We generally defer to an agency's decision to 
proceed on the basis of imperfect scientific information, rath-
er than to 'invest the resources to conduct the perfect 
study.' " Sierra Club v. EPA, 167 F.3d 658, 662 (D.C. Cir. 
1999) (quoting American Iron & Steel Inst. v. EPA, 115 F.3d 
979, 1004 (D.C. Cir. 1997)).

 B

 As a second source of statutory support for their argument 
that the Clean Air Act requires a VOC-specific approach, 

petitioners note that in establishing "criteria for regulating 
consumer and commercial products," Congress directed EPA 
to take into consideration "[t]hose consumer and commercial 
products which emit highly reactive volatile organic com-
pounds into the ambient air." 42 U.S.C. s 7511b(e)(2)(B)(iii). 
But EPA expressly complied with this congressional com-
mand, adopting as one of its criteria "emissions of highly 
reactive compounds." See Report at 4-6 (J.A. at 562). As 
noted above, the agency implemented this criterion by identi-
fying ten classes of VOCs as "highly reactive," and using that 
classification to give priority to consumer and commercial 
products that emitted those highly reactive compounds. See 
Final Listing, 63 Fed. Reg. at 48,796. Accordingly, this 
statutory citation does not add to the weight of petitioners' 
challenge.

 C

 Finally, petitioners note that section 183(e)(3)(A) requires 
EPA to "list those categories of consumer or commercial 
products" that "account for at least 80 percent of the VOC 
emissions, on a reactivity-adjusted basis, from consumer or 
commercial products in areas that violate the NAAQS for 
ozone." 42 U.S.C. s 7511b(e)(3)(A). EPA is then directed to 
"divide the list into 4 groups establishing priorities for regula-
tion," and to regulate one group every two years until all have 
been regulated. Id.

 To comply with these requirements, EPA first used the 
methodology we have described above: it divided VOCs into 
three sets, exempting those with negligible reactivity and 
applying an (upward) reactivity adjustment factor to the mass 
emissions of products with highly reactive ingredients. After 
ranking product categories based on eight regulatory criteria, 
see supra Part I, EPA developed the required list of regulat-
ed categories by starting with the highest ranked category 
and proceeding through successive categories until the list 
accounted for 80% of the emissions, adjusted for reactivity. 
See Final Listing, 63 Fed. Reg. at 48,796. The agency 
identified architectural coatings as "one of the largest sources 

of VOC emissions among categories of consumer and com-
mercial products," id. at 48,797, and therefore included it 
within the first group of regulated categories.

 Because EPA did not evaluate each VOC's individual reac-
tivity, petitioners contend that "products containing less-
reactive compounds were included in an early group when, 
instead, they should have been exempted or regulated, if at 
all, in later stages." Allied Br. at 20. Petitioners argue that 
these two possibilities--that some compounds were regulated 
that should have been exempted, and that architectural coat-
ings as a category were given priority regulation when they 
should have been regulated in one of the later groups--
render EPA's methodology inconsistent with the statute's 
command to account for VOC emissions "on a reactivity-
adjusted basis." We disagree.

 First, the possibility that some compounds that were regu-
lated should not have been regulated at all is not likely 
enough to undermine EPA's methodology. As explained 
above, EPA expressly exempted from regulation those com-
pounds determined to have negligible reactivity. Moreover, 
pre-existing EPA regulations allow companies to apply to 
have a compound excluded from the definition of VOC, and 
thereby exempted from regulation, based on evidence that it 
is negligibly reactive. See Final Listing, 63 Fed. Reg. at 
48,798 (citing 40 C.F.R. s 51.100(s)). Working with industry, 
EPA has exempted more than 100 VOC species (42 com-
pounds and 2 classes of compounds) under this provision. 
See Response to Comments at 2-90 (J.A. at 755); Final 
Listing, 63 Fed. Reg. at 48,798. Since data necessary to 
determine negligible reactivity are available for "nearly all 
VOC species of interest," Report at 3-5 (J.A. at 550), and 
since even petitioners concede that all VOCs have some 
potential to contribute to ozone formation, see Oral Arg. Tr. 
at 27; see also Final Listing, 63 Fed. Reg. at 48,797, petition-
ers' challenge does not cast doubt on EPA's regulatory 
process.

 Nor is the second possibility, that in a perfect regulatory 
world architectural coatings would not be in the first group of 

regulated products, of great moment in evaluating the reason-
ableness of EPA's method of regulation. There is no serious 
argument that architectural coatings would not appear some-
where on even a perfect regulatory list, given their status as 
one of the largest sources of VOC emissions among consumer 
and commercial products. Indeed, section 183(e) directs the 
EPA to list those categories of consumer or commercial 
products that account for "at least" 80% of VOC emissions on 
a reactivity-adjusted basis--implying that it could list catego-
ries accounting for 100% of such emissions. As to exactly 
where on that list architectural coatings should have ranked, 
we can only say what we have repeatedly said before: An 
"agency is entitled to the highest deference in deciding priori-
ties among issues, including the sequence and grouping in 
which it tackles them." Associated Gas Distribs. v. FERC, 
824 F.2d 981, 1039 (D.C. Cir. 1987); see Sierra Club v. 
Thomas, 828 F.2d 783, 797 (D.C. Cir. 1987). Moreover, we 
must be particularly deferential in a case like this, where 
Congress--by instructing EPA to set priorities using multi-
ple, nondeterminative criteria6--has necessarily indicated an 
intention to delegate substantial discretion to the agency.

 In sum, we conclude that nothing in the Clean Air Act 
unambiguously requires the EPA to analyze the reactivity of 
each VOC on an individual basis, and that EPA's more 
categorical approach is a reasonable interpretation of the 
reactivity-related requirements of the Act. Accordingly, the 
architectural coatings rule survives review under the stan-
dard set by the Supreme Court in Chevron.

 D

 Petitioners contend that even if the Clean Air Act does not 
require EPA, as a matter of statutory construction, to regu-
late VOCs based on an analysis of their relative individual 
reactivities, the agency must nonetheless do so to avoid 

__________
 6 Congress directed EPA to establish regulatory priorities 
based on criteria which "take into consideration" at least five listed 
factors. 42 U.S.C. s 7511b(e)(2)(B); see also supra note 3; infra 
Part IV.E.

regulating in an arbitrary and capricious fashion. As peti-
tioners note, EPA's own report conceded that: "[t]o be the 
most effective, ozone control strategies ideally should be 
based not only on mass VOC and NOx emissions but should 
consider the relative photochemical reactivity of individual 
species." Report at 2-1 (J.A. at 523); see also Notice of 
Product Category List, 60 Fed. Reg. at 15,266. The key 
words in the quoted sentence, however, are "to be the most 
effective" and "ideally." Indeed, in the sentence following the 
one just quoted, EPA went on to state:

 Reactivity data on VOC, especially those compounds used 
 to formulate consumer and commercial products, is ex-
 tremely limited. Better data, which can be obtained only 
 at great expense, is needed if the EPA is to consider 
 relative photochemical reactivity in any VOC control 
 strategy. In the meantime, a practical approach is to act 
 on the basis of mass VOC emissions.
 
Report at 2-1 (J.A. at 523). In short, the agency concluded 
that the methodology it adopted, and which we have de-
scribed above, was the "most appropriate way to meet the 
statutory requirements, given the limitations and uncertain-
ties surrounding the reactivity issue." Report at 3-10 (J.A. 
at 555).

 Our role, of course, is to determine neither whether EPA's 
approach was "ideal," nor whether it was the "most appropri-
ate," but only whether it was reasonable. See Ethyl Corp. v. 
EPA, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc) ("We must 
look at the decision not as the chemist, biologist or statistician 
that we are qualified neither by training nor experience to be, 
but as a reviewing court exercising our narrowly defined duty 
of holding agencies to certain minimal standards of rationali-
ty."); see also State Farm, 463 U.S. at 43. For the reasons 
discussed in Part III.A-C above, we conclude that it was. 
See Animal Legal Defense Fund, Inc. v. Glickman, 204 F.3d 
229, 234 (D.C. Cir. 2000) (noting overlap between analysis 
under Chevron and State Farm). We agree with the agency 
that its general reliance on the mass of VOC emissions, 
coupled with the exemption for those VOCs known to be 

negligibly reactive and the upward adjustment for those 
known to be highly reactive, constitutes a reasonable ap-
proach given both "the uncertainties and inconsistencies of 
reactivity," Report at 2-10 (J.A. at 532), and "Congress's 
direction that the EPA complete the study within three 
years," Final Listing, 63 Fed. Reg. at 48,796. In reaching 
this conclusion, "[o]ur analysis is guided by the deference 
traditionally given to agency expertise, particularly when 
dealing with a statutory scheme as unwieldy and 
science-driven as the Clean Air Act." Appalachian Power 
Co. v. EPA, 135 F.3d 791, 801-02 (D.C. Cir. 1998).

 IV

 In this Part, we consider a number of additional, miscella-
neous charges leveled by petitioners against the architectural 
coatings rule. Some raise questions of statutory interpreta-
tion under the Clean Air Act, some charge EPA with arbi-
trary and capricious decisionmaking under that Act, and some 
involve a combination of the two.

 A

 Dunn-Edwards attacks the EPA study for "fail[ing] to 
address the beneficial environmental and health effects of the 
negative reactivity" of some VOCs. Dunn-Edwards Br. at 
12. There is evidence, the company contends, showing that 
the emissions of certain types of VOCs actually reduce ozone 
levels. The agency's failure to consider the positive health 
effects of a restricted pollutant, Dunn-Edwards continues, 
constitutes both a violation of the Clean Air Act and unrea-
sonable agency action. See Dunn-Edwards Br. at 13 (citing 
American Trucking Ass'n v. EPA, 175 F.3d 1027, 1051 (D.C. 
Cir. 1999), cert. granted, 68 U.S.L.W. 3496 (U.S. May 22, 
2000)).

 The answer to this challenge is that EPA did consider the 
possible effects of negative reactivity. See Response to Com-
ments at 2-92 to 2-95 (J.A. at 757-760). It concluded, 
however, that the phenomenon was too rare and unpredict-
able to warrant changes in the regulatory structure. See id. 
at 2-92 to 2-93 (J.A. at 757-58) (concluding that "reduction of 

ozone by VOC occurs in very limited circumstances"). Nega-
tive reactivity, the agency determined, occurs "only in very 
limited cases, with only a few species of VOC (not VOC 
species typically used in consumer and commercial products), 
and under specific meteorological conditions." Id. at 2-154 
(J.A. at 802). Studies offered by petitioners were not to the 
contrary. See, e.g., J.A. at 985-86 (study describing "slightly 
negative values" for two compounds in one-hour test in Los 
Angeles, but noting that all compounds tested there showed 
positive values in eight-hour tests). Because EPA reasonably 
considered, and discounted, the phenomenon of negative reac-
tivity, we reject this challenge.

 B

 In a related attack, Dunn-Edwards contends that EPA's 
rule may also be counterproductive because it "has the poten-
tial to increase ozone levels in two ways." Dunn-Edwards 
Br. at 21. First, because the rule imposes limits on the mass 
of VOCs in a product, rather than on the type (reactivity) of 
the VOCs, it "allows for the possibility" that producers of 
architectural coatings may substitute more reactive VOCs for 
less reactive ones. Id. Although the reformulated products 
would then emit a smaller quantity of VOCs as measured by 
mass, they would generate more ozone over all. Second, 
Dunn-Edwards warns, "if performance is compromised" by 
reducing the VOC content of architectural coatings, the over-
all volume of such products used to attain the same results 
will increase--in the form of more coats, more touch-ups, and 
more frequent recoating. Id.

 As the quoted portions of petitioner's argument suggests, it 
is framed more as a series of theoretical possibilities than of 
fact-based predictions. Petitioners offer no evidence at all 
that the VOC substitution they fear will occur. EPA's own 
view is that even if such substitution did occur, the benefit 
from reducing the total mass of VOC emissions would out-
weigh any differences in relative reactivities of different 
compounds. See EPA, National Volatile Organic Compound 
Emission Standards for Architectural Coatings, Background 

for Promulgated Standards 2-297 (1998) (J.A. at 437) [herein-
after Background]. In the absence of contrary evidence, it is 
to the expert agency's prediction, rather than to the petition-
er's, that we must defer. See Her Majesty the Queen in 
Right of Ontario v. EPA, 912 F.2d 1525, 1534 (D.C. Cir. 
1990); New York v. EPA, 852 F.2d 574, 580 (D.C. Cir. 1988).

 EPA also found "no evidence or documentation to support 
the[ ] claims [that] increased thinning, more priming, more 
topcoating, and more frequent painting" would result if the 
VOC content of architectural coatings were reduced. Back-
ground at 2-293 (J.A. at 433). To the contrary, the agency 
cited evidence that low VOC content coatings perform well 
and do not require additional coats to achieve the same 
results as those with high VOC content. See Background at 
2-293 to 2-297 (J.A. at 433-37); Proposed Rule, 61 Fed. Reg. 
at 32,738; see also Final Rule, 63 Fed. Reg. at 48,869 (finding 
"no link between product quality and VOC content since 
quality, high-performing products are available in a wide 
range of VOC content levels in many product categories"). 
In reply, Dunn-Edwards cites a California survey indicating 
that between 1980 and 1990, total VOC emissions from archi-
tectural coatings increased by 16%, notwithstanding that the 
VOC content of such coatings decreased by 37% during the 
same period. See Dunn-Edwards Reply Br. at 10. Poorer 
performance by the reduced VOC paint "may be responsible," 
Dunn-Edwards asserts. Id. And it may be that Dunn-
Edwards is right. But without evidence of cause-and-effect, 
we cannot know. Dunn-Edwards offers no evidence that the 
increase in VOC emissions during the 1980s was due to the 
poorer performance of the paints, rather than to the cause 
suggested by the EPA: an increase in the volume of paints 
used during that time, spurred by growth in the population, 
an improved economy, and an increase in construction.

 C

 The architectural coatings rule regulates the manufacture 
and sale of coating products nationwide. Allied contends that 
this exceeds EPA's authority, which it asserts is limited to 

regulating manufacture and sale within "nonattainment" ar-
eas. A nonattainment area is one that either does not meet 
the national primary or secondary ambient air quality stan-
dard for ozone, or that contributes to ozone levels in a nearby 
area that does not meet the standard. See 42 U.S.C. 
s 7407(d). Allied's contention principally relies on two sub-
sections of section 183(e). First, subsection (2)(A) requires 
EPA to study VOC emissions in order to determine their 
potential "to contribute to ozone levels which violate the 
national ambient air quality standard for ozone." Id. 
s 7511b(e)(2)(A)(i). Second, subsection (3)(A) requires the 
EPA to list, and then to regulate, those categories of products 
that "account for at least 80 percent of the VOC emissions 
... from consumer or commercial products in areas that 
violate the NAAQS for ozone." Id. s 7511b(e)(3)(A).

 Neither of these provisions says anything about where the 
regulated product itself must be manufactured or sold, or 
about the geographic scope of EPA's regulatory authority. 
Rather, the first directs EPA to consider the potential of 
emissions to contribute to ozone levels that violate the 
NAAQS; the second instructs it to regulate categories of 
products that account for a specified percentage of emissions 
in nonattainment areas. As EPA concludes, this language 
permits the agency to regulate nationwide in order to accom-
plish emissions reduction in nonattainment areas.

 EPA's reading is bolstered by consideration of other provi-
sions in the same section. For example, subsection (3)(A) 
also states that "[i]n order to carry out this section, the 
Administrator may, by regulation, control or prohibit any 
activity, including the manufacture or introduction into com-
merce, offering for sale, or sale of any consumer or commer-
cial product." Id. s 7511b(e)(3)(A) (emphasis added); see 
also id. s 7511b(e)(4) ("The regulations under this subsection 
may include any system or systems of regulation as the 
Administrator may deem appropriate."). Similarly, subsec-
tion (1)(C) defines "regulated entities" as manufacturers and 
distributors of consumer or commercial products for sale in 
interstate commerce "in the United States," without geo-
graphic limitation. Id. s 7511b(e)(1)(C)(i). Thus, although 

Congress did direct EPA to regulate VOCs in order to 
improve conditions within nonattainment areas, nothing in the 
statute limits its ability to regulate the manufacture and sale 
of VOCs outside such areas if such regulation is reasonably 
related to that end.7

 EPA readily persuades us that nationwide regulation is 
reasonably related to the statutory objective. First, architec-
tural coating products are widely distributed and easily trans-
portable across area boundaries. See Final Listing, 63 Fed. 
Reg. at 48,804. End-users (e.g., commercial painters) them-
selves may well utilize these products in different locations 
from day to day. See id.8 Accordingly, as EPA reasoned, a 
national rule is necessary to "preempt opportunities for end-
users to purchase such consumer and commercial products in 
attainment areas and then use them in nonattainment areas, 
thereby circumventing the regulations and undermining the 
decrease in VOC emissions in nonattainment areas." Final 
Listing, 63 Fed. Reg. at 48,804.

 Second, just as coating products are easily transportable, 
so too are the VOCs they release and the ozone the VOCs 

__________
 7 For that reason, section 183(e) is different from Clean Air Act 
section 165(a), which we considered in Alabama Power Co. v. Costle, 
636 F.2d 323 (D.C. Cir. 1979). The latter section expressly limits 
EPA's permit authority to facilities "constructed in any area to 
which [Part C] applies," 42 U.S.C. s 7475(a) (emphasis added),
See Alabama 
Power, 636 F.3d at 365. Section 183(e) does not contain an analo-
gous limitation.

 8 As the National Paint & Coatings Association wrote in its 
intervening brief in support of the EPA:

 A manufacturer or distributor, whether big or small, that sells 
 an architectural coatings product can never be sure where that 
 product will end up being used. For example, a small manu-
 facturer in Maryland who manufacturers his paint solely in 
 Maryland and sells his paint to contractors only in Maryland 
 may have his paint used in Washington, D.C. one day, Virginia 
 the next day, West Virginia the next day, and finally used to 
 paint a weekend beach house in Delaware the next day.
 
NPCA Br. at 24.

create. Ambient VOCs and ozone do not obey geographic 
boundaries and can flow freely between attainment and non-
attainment areas. See Final Listing, 63 Fed. Reg. at 48,804; 
see also Virginia v. EPA, 108 F.3d 1397, 1400 (D.C. Cir. 
1997). Thus, EPA reasonably concluded that "emissions in 
attainment areas can contribute to nonattainment in adjoining 
nonattainment areas," and that a nationwide rule is therefore 
consistent with its statutory mandate. Final Listing, 63 Fed. 
Reg. at 48,803.

 D

 Dunn-Edwards contends that because section 183(e) re-
quires a study of "emissions of volatile organic compounds 
into the ambient air," 42 U.S.C. s 7511b(e)(2)(A), EPA violat-
ed its directive by focusing its study and rule on VOC content 
rather than emissions. That focus, petitioner suggests, as-
sumes without foundation that all VOCs contained in a coat-
ing will be emitted into the ambient air. But EPA did not 
assume that all of a product's VOCs would be emitted. 
Rather, it employed a test to determine the mass of solvents 
that would volatize, and limited its calculation of VOC content 
to the latter alone.9

 Dunn-Edwards also contends that even when VOCs are 
emitted from a product, they may not become "available" in 
the atmosphere to form ozone--for example, because they 
may be emitted indoors rather than outside. EPA considered 

__________
 9 In EPA's test, the paint sample is weighed, heated, and 
reweighed. VOC content is calculated as the difference in the two 
weights, after also subtracting the weight of water and any exempt 
compounds. Hence, solvents that do not volatize under the test 
conditions are not measured as VOC. See Response to Comments 
at 2-56 (J.A. at 723). In a footnote, Dunn-Edwards contends that 
because paints are not heated when applied, this test "does not bear 
the necessary relationship to actual conditions in which coatings are 
used." Dunn-Edwards Br. at 16 n.16 (citing Chemical Mfrs. Ass'n 
v. EPA, 28 F.3d 1259, 1264 (D.C. Cir. 1994)). EPA's rejoinder is 
that heating simply accelerates the emissions of VOC, but does not 
increase total emissions over time. In the absence of contrary 
evidence, we defer to the agency's expert opinion.

this assertion during the rulemaking, and responded by point-
ing to recent studies suggesting that "close to 100 percent of 
the VOC from paint is eventually emitted into the ambient 
air." Response to Comments at 2-64 (J.A. at 729). Because 
this conclusion is supported by substantial evidence, the 
agency's decision to control VOC emissions through the regu-
lation of VOC content is reasonable.10

 E

 Section 183(e) directs EPA to take into consideration five 
factors in establishing criteria for regulating consumer and 
commercial products, as well as in establishing regulatory 
priorities among those products. See 42 U.S.C. 
s 7511b(e)(2)(B), (e)(3)(A). Allied contends that EPA erred 
by failing to consider the last three factors listed in the 
statute:

 (iii) Those consumer and commercial products which 
 emit highly reactive volatile organic compounds into the 
 ambient air.
 
 (iv) Those consumer and commercial products which are 
 subject to the most cost-effective controls.
 
 (v) The availability of alternatives (if any) to such con-
 sumer and commercial products which are of comparable 
 costs, considering health, safety, and environmental im-
 pacts.
 
__________
 10 Dunn-Edwards also contends that EPA was required to 
account for reactivity variation caused by differences in the makeup 
of the ambient air in different airsheds, noting that the agency 
conceded that "ideally" ozone control strategies should consider the 
conditions in specific airsheds. See Dunn-Edwards Br. at 17 n.17 
(citing Report at 2-1 (J.A. at 523)). Nothing in the statutory 
language, however, requires airshed-by-airshed analysis. Nor does 
this court's authority extend to requiring EPA to utilize the "ideal" 
strategy, particularly not when the agency concludes that such a 
strategy is not practical in light of the limitations of the existing 
data. See Report at 2-1 (J.A. at 523).

Id. s 7511b(e)(2)(B).11 We reject this challenge.

 First, EPA did consider the three listed factors. Each was 
expressly included among the regulatory criteria adopted by 
the agency, and was applied in establishing regulatory priori-
ties. See Report at 4-6 (J.A. at 562) (factor iii); id. at 4-10 to 
4-11 (J.A. at 566-67) (factor iv); id. at 4-8 to 4-9 (J.A. at 
564-65) (factor v); see also Final Listing, 63 Fed. Reg. at 
48,794 (listing criteria); Notice of Product Category List, 60 
Fed. Reg. at 15,266 (same); Report at 4-12 to 4-13 (J.A. at 
568-69) (describing application of the criteria); EPA, Nation-
al Air Pollution Control Techniques Advisory Committee 
Meeting on Consumer and Commercial Products 53 (1995) 
(J.A. at 700) (describing EPA's scoring of product categories 
based on the criteria).

 Second, EPA's consideration of these factors was adequate 
to constitute reasoned decisionmaking. As we have discussed 
above, EPA considered the third factor by assigning greater 
weight to those products that emit VOCs from one of the ten 
classes of VOCs that are highly reactive, an approach we 
regard as consistent with the statute and neither arbitrary 
nor capricious. See supra Part III. EPA reasonably consid-
ered the fourth factor by assigning a higher priority to 
categories of products that can reduce VOC emissions at 
lowest cost. See Report at 4-10 to 4-11 (J.A. at 566-67).12 
And EPA adequately considered the fifth factor, the availabil-
ity of alternatives at comparable costs, by applying a criterion 
that evaluated the possibility of reformulation of the product 
and the availability of substitutes. See Report at 4-8 to 4-9 

__________
 11 The first two factors listed in the statute are: "(i) The uses, 
benefits, and commercial demand of consumer and commercial 
products[; and] (ii) The health or safety functions (if any) served by 
such consumer and commercial products." 42 U.S.C. 
s 7511b(e)(2)(B).

 12 EPA used cost-effectiveness data where it was available, and 
where it was not, used a matrix that considered the availability of 
alternatives and the mass of emissions from the product. See 
Report at 4-10 to 4-11 (J.A. at 566-67).

(J.A. at 564-65); see also Response to Comments at 2-27 (J.A. 
at 714).13

 In addition to alleging that EPA failed to consider these 
three statutorily-enumerated factors, Allied contends that 
EPA impermissibly considered two further factors not listed 
in the statute: "magnitude of annual VOC emissions" and 
"regulatory efficiency and program considerations." Final 
Listing, 63 Fed. Reg. at 48,794; see supra note 3. Although 
it is true that "an agency rule would be arbitrary and 
capricious if the agency has relied on factors which Congress 
has not intended it to consider," State Farm, 463 U.S. at 43, 
that is not the case here. Nothing in section 183(e) suggests 
that Congress intended to limit EPA's consideration to the 
five factors specified in the statute. Indeed, the structure of 
the section suggests the contrary. Subsection (2)(A) first 
directs the agency to "establish criteria"; subsection (2)(B) 
then directs that "[i]n establishing the criteria," the agency 
"shall take into consideration" the five listed factors. The 
reasonable inference taken by EPA is that while it must 
consider the five listed factors, it is not barred from consider-
ing additional ones. See George Warren Corp. v. EPA, 159 
F.3d 616, 624 (D.C. Cir. 1998) (noting this court's "usual 
reluctance to infer from congressional silence an intention to 
preclude the agency from considering factors other than 
those listed in a statute").

 Moreover, the two additional criteria are reasonable in light 
of the use to which Congress wanted all of the criteria to be 
put: establishing regulatory priorities among the categories 
of consumer and commercial products. See 42 U.S.C. 
s 7511b(e)(3)(A). We have already considered, and judged 
permissible, EPA's accordance of greater regulatory priority 
to product categories that emit greater masses of VOCs--the 
first of the two additional criteria. See supra Part III. The 
agency's consideration of the second additional factor, denom-
inated as "regulatory efficiency," seems nothing more than 

__________
 13 EPA reasonably relied on consumer acceptance, as measured 
by market share data, as a surrogate for cost data which was of 
limited availability. See Report at 4-8 to 4-9 (J.A. at 564-65); see 
also Response to Comments at 2-27 (J.A. at 714).

regulatory common sense: in determining priorities, EPA 
considered which categories it could regulate quickly because, 
for example, the agency had ongoing or recently completed 
rulemakings concerning them, or because they raised factual 
issues in common with other categories. See Report at 4-12 
to 4-13 (J.A. at 568-69).

 V

 So far, we have considered challenges to the architectural 
coatings rule based on the Clean Air Act. In this part, we 
consider Allied's claims that the rule is contrary to the 
Regulatory Flexibility Act (RFA)14 as amended by the Small 
Business Regulatory Enforcement Fairness Act of 1996 
(SBREFA),15 and to the Unfunded Mandates Reform Act 
(UMRA).16

 A

 Section 603(a) of the RFA requires that an agency, at the 
time of issuance of a notice of proposed rulemaking, publish 
an initial regulatory flexibility analysis which "shall describe 
the impact of the proposed rule on small entities." 5 U.S.C. 
s 603(a). Section 603(c) requires that such an initial analysis 
also describe "any significant alternatives to the proposed 
rule which accomplish the stated objectives" of the applicable 
statute while minimizing significant economic impact on small 
entities. Id. s 603(c). Allied contends that EPA failed to 
comply with section 603(a) by failing to discuss two such 
economic impacts: "stigmatic harm" allegedly arising from 
the agency's suggestion that it may impose more stringent 
VOC limits in future regulations;17 and asset devaluation, in 
that the coatings rule allegedly will render existing product 

__________
 14 5 U.S.C. ss 601 et seq.

 15 Pub. L. No. 104-121, ss 241-42, 101 Stat. 857, 864-68 (1996).

 16 2 U.S.C. ss 1501 et seq.

 17 In announcing the architectural coatings rule, EPA stated 
that in the future "an additional study for this category may be 

formulas valueless. Allied also contends that EPA failed to 
comply with section 603(c) by failing to consider label di-
rections as an alternative to VOC limits.

 We are without jurisdiction to consider these challenges to 
EPA's compliance with the initial regulatory flexibility analy-
sis requirements of section 603. Section 611(c) of the RFA 
states that "[c]ompliance or noncompliance by an agency with 
the provisions of this chapter shall be subject to judicial 
review only in accordance with this section." 5 U.S.C. 
s 611(c). Section 611(a) specifically lists the sections of the 
RFA subject to judicial review, and section 603 is not on the 
list.18 See id. s 611(a)(1), (2).

__________
warranted to determine the feasibility of additional reductions in 
VOC limits." Final Rule, 63 Fed. Reg. at 48,872. Allied contends 
not only that this announcement imposes a "stigma" on manufactur-
ers, but that EPA would be without authority to issue such addi-
tional reductions. EPA replies, inter alia, that this claim is unripe: 
The agency has not yet decided whether it will issue any further 
regulations, and Allied has not established that it will suffer any 
harm in the interim. We agree. See Grand Canyon Air Tour 
Coalition v. FAA, 154 F.3d 455, 471 (D.C. Cir. 1998); Florida 
Power & Light Co. v. EPA, 145 F.3d 1414, 1419-21 (D.C. Cir. 1998). 
Allied "will have ample opportunity later to bring its legal challenge 
at a time when harm is more imminent and more certain." Ohio 
Forestry Ass'n v. Sierra Club, 523 U.S. 726, 734 (1998).

 18 In its reply brief, Allied notes that unlike challenges to an 
agency's compliance with section 603 (concerning initial regulatory 
flexibility analyses), challenges to compliance with RFA section 604 
(concerning final regulatory flexibility analyses) are included in the 
jurisdictional list of section 611. Allied suggests that the challenges 
noted in the above text can be reformulated as challenges to 
compliance with section 604. In relevant part, that section requires 
the agency to describe the steps it has taken "to minimize the 
significant economic impact on small entities consistent with the 
stated objectives of applicable statutes, including a statement of ... 
why each of the other significant alternatives to the rule considered 
by the agency ... was rejected." 5 U.S.C. s 604(a)(5) (emphasis 
added). For the reasons noted in the text, Allied has not estab-

 That, however, is not the end of the story. As Allied points 
out, although we may not review EPA's handling of these 
issues in terms of the agency's compliance with the RFA, we 
may consider them in determining whether EPA complied 
with the overall requirement that an agency's decisionmaking 
be neither arbitrary nor capricious. See Clean Air Act, 42 
U.S.C. s 7607(d)(9)(A); see also APA, 5 U.S.C. s 706(2)(A). 
That was the law prior to passage of SBREFA's amendments 
to the RFA, see Thompson v. Clark, 741 F.2d 401, 405 (D.C. 
Cir. 1984); Small Refiner Lead Phase-Down Task Force v. 
EPA, 705 F.2d 506, 539 (D.C. Cir. 1983), and it was not 
altered by those amendments.19

 For an agency's decisionmaking to be rational, it must 
respond to significant points raised during the public com-
ment period. See Home Box Office, Inc. v. FCC, 567 F.2d 9, 
35-36 (D.C. Cir. 1977). EPA did so here. The agency stated 
that it was not aware of any stigmatic harm of the kind urged 
by Allied, and reasonably concluded that the comments sub-
mitted on the subject had "not provided enough detail to 
allow the EPA to consider the issue further." Background at 
2-334 (J.A. at 474). Allied's unadorned allegation in its brief, 
that "[s]uch impacts are significant," Allied Br. at 23, adds no 
further detail and no reason to require further agency re-
sponse. EPA also reasonably rejected the contention that it 
was ignoring the regulation's impact on the value of existing 

__________
lished that the economic impacts and regulatory alternative it 
contends EPA ignored can be classified as "significant."

 19 Prior to the amendments, section 611(b) stated: "When an 
action for judicial review of a rule is instituted, any regulatory 
flexibility analysis for such rule shall constitute part of the whole 
record of agency action in connection with the review." 5 U.S.C. 
s 611(b) (1994). In Thompson, 741 F.2d at 405, we held that those 
words "mean[ ] that the reviewing court will consider the contents 
of the preliminary or final regulatory flexibility analysis, along with 
the rest of the record, in assessing not the agency's compliance with 
the Regulatory Flexibility Act, but the validity of the rule under 
other provisions of law," particularly the APA. The current version 
of section 611(b) contains the same words, with minor stylistic 
alterations.

product formulas, noting that to the contrary it was directly 
considering that impact by analyzing the effect of the regula-
tion on annual profits per product. See Background at 2-334 
(J.A. at 474).

 To be regarded as rational, an agency must also consider 
significant alternatives to the course it ultimately chooses. 
See State Farm, 463 U.S. at 48-51; Grand Canyon Air Tour 
Coalition v. FAA, 154 F.3d 455, 471 (D.C. Cir. 1998); Public 
Citizen v. Steed, 733 F.2d 93, 99 (D.C. Cir. 1984). Allied 
contends that the agency should have considered imposing a 
requirement that labels contain directions for responsible use 
of coating products, as an alternative to imposing VOC limits 
on such products.20 But the agency did consider the possibili-
ty of imposing label directions as an addition to product 
reformulation, and even in that respect found "it would be 
impossible to predict the VOC reductions achieved by provid-
ing the consumer with directions for use." Report at 2-14 
(J.A. at 536). Allied offers no response to this defect in the 
labeling alternative, and no reason to believe that such an 
approach would accomplish the objectives of the Clean Air 
Act. Accordingly, we reject Allied's challenges under the 
RFA.21

__________
 20 The Clean Air Act authorizes, but does not require, "di-
rections for use" as one of numerous possible means of achieving 
emissions reduction. 42 U.S.C. s 7511b(e)(1)(A) (defining "best 
available controls" as the degree of emissions reduction achievable 
through application of "the most effective equipment, measures, 
processes, methods, systems or techniques, including chemical re-
formulation, product or feedstock substitution, repackaging, and 
directions for use, consumption, storage, or disposal").

 21 Allied briefly raises two further RFA claims. First, it 
charges that the agency failed to comply with the requirement of 
section 609(b) that it, inter alia, convene a review panel prior to 
issuing the initial regulatory flexibility analysis. This court, howev-
er, has no jurisdiction to review challenges to an agency's compli-
ance with section 609(b). See 5 U.S.C. s 611(a)(1)-(2), (c). Second, 
Allied contends that EPA failed to comply with the requirement of 
section 601(3) that it provide an opportunity for public comment 
before adopting (as it did) a definition of the term "small business" 

 B

 Allied contends that EPA violated provisions of the Un-
funded Mandates Reform Act that require preparation of a 
written cost-benefit analysis, see 2 U.S.C. s 1532(a)(2), and 
selection of the "least costly, most cost-effective or least 
burdensome alternative that achieves the objectives of the 
rule," id. s 1535(a). UMRA itself expressly denies courts 
jurisdiction to review compliance with the latter provision. 
See id. s 1571(b)(1); see also id. s 1571(a). And while the 
Act permits limited judicial review of compliance with the 
requirement to prepare a written cost-benefit analysis,22 that 
requirement is not triggered unless the rule in question may 
result in expenditures of $100 million or more in any one 
year, see id. s 1532(a). Because EPA estimated the total 
cost associated with the architectural coatings rule to be only 
$32 million per year, see Final Rule, 63 Fed. Reg. at 48,855, it 
concluded that UMRA was inapplicable. See id. at 48,875-76.

 Allied challenges EPA's cost estimate, but advances little 
basis for such a challenge beyond the complaints we consid-
ered above in the context of Allied's RFA claim: Petitioner 
contends that EPA ignored the "stigmatic" costs it imposed 
through its suggestion that more stringent VOC limits might 

__________
different from that referenced in the statute. See 5 U.S.C. 
s 601(3); 15 U.S.C. s 632(a). Although we do have jurisdiction to 
review a section 601 challenge, see 5 U.S.C. s 611(a)(1)-(2), Allied's 
challenge fails on the merits because EPA did provide an opportuni-
ty for public comment on its proposed definition. See National 
Volatile Organic Compound Emission Standards for Architectural 
Coatings, Extension of Public Comment Period, 61 Fed. Reg. 
46,410, 46,411 (1996); Background at 2-373 to 2-375, 2-424 to 2-426 
(J.A. at 480-82, 490-92).

 22 UMRA, 2 U.S.C. s 1571(a)(2)(A), states that agency compli-
ance with section 1532 is subject to judicial review only under 5 
U.S.C. s 706(1) (court may compel agency action unlawfully with-
held). If an agency fails to prepare the written statement required 
by section 1532, "a court may compel the agency to prepare such 
written statement," 2 U.S.C. s 1571(a)(2)(B), but the failure may 
"not be used as a basis for ... invalidating or otherwise affecting 
[the] rule," id. s 1571(a)(3).

be promulgated in the future, as well as the impact of the 
coatings rule on the market value of existing product formu-
las.23 We concluded above that EPA dealt with these issues 
in a reasonable manner and, given the limited judicial review 
applicable to compliance with section 1532(a), see supra note 
22, we have no warrant for inquiring further under UMRA.24

 VI

 Finally, we consider Allied's argument that in regulating 
architectural coatings, Congress exceeded its constitutional 
authority "[t]o regulate Commerce ... among the several 
States." U.S. Const., art. I, s 8, cl. 3. Dunn-Edwards does 
not join in this attack, and the intervenor National Paint & 
Coatings Association actively opposes it, preferring uniform 
national regulation to the "multiple, divergent state rules" 
that would otherwise hold sway. NPCA Br. at 3. The crux 

__________
 23 Allied's brief also asserts, without elaboration, that EPA 
"excluded from its calculus losses to (1) retailers, (2) contractors, (3) 
workers, and (4) consumers," and that each of these categories 
"may alone reach $100,000,000 in any year." Allied Br. at 25. But 
EPA did consider the effect of the rule on many of these groups, see 
EPA, Draft Economic Impact Analysis and Regulatory Flexibility 
Analysis of Air Pollution Regulations: Architectural and Indus-
trial Maintenance Coatings 2-32 to 2-40, 2-44 to 2-45 (J.A. at 33-
41, 45-46); Background at 2-364 to 2-366 (J.A. at 1017-19), and 
Allied offers neither support for nor explanation of the loss calcula-
tion it asserts.

 24 In a related argument, Dunn-Edwards contends that EPA 
must consider costs in the course of examining "economic feasibili-
ty," a factor in the evaluation of "best available controls" under the 
statute, 42 U.S.C. s 7511b(e)(1)(A). Dunn-Edwards argues that 
EPA's cost estimate was arbitrary and capricious, largely because 
the agency reduced its initial estimate after receiving cost estimates 
submitted by commenters without determining the reliability of 
those estimates. In fact, EPA did evaluate the reasonableness of 
the comments, utilizing data from only 11 out of 27 because the 
others suffered from incompleteness or lack of clarity, or from a 
failure to provide cost information on a per product basis. See 
Background at 2-304 to 2-305 (J.A. at 444-45).

of Allied's argument is that EPA's regulation exceeds Con-
gress' authority under the Commerce Clause because there is 
an insufficient nexus between coatings manufacture, which it 
describes as an intrastate event, and the interstate phenome-
non of ozone formation.

 Allied attempts to rely on the Supreme Court's decision in 
United States v. Lopez, 514 U.S. 549 (1995), striking down the 
Gun-Free School Zones Act25 which made it a federal crime 
knowingly to possess a firearm in a school zone. In United 
States v. Morrison, 68 U.S.L.W. 4351 (U.S. May 15, 2000), 
handed down last month, the Court relied on Lopez in holding 
that Congress also lacked authority under the Commerce 
Clause to provide a federal civil remedy for the victims of 
gender-motivated violence. In both cases, the Court agreed 
that " 'Congress' commerce authority includes the power to 
regulate those activities having a substantial relation to inter-
state commerce, ... i.e., those activities that substantially 
affect interstate commerce.' " Id. at 4354 (quoting Lopez, 514 
U.S. at 558-59). As Morrison explained, however, four con-
siderations contributed to Lopez's conclusion that the Gun-
Free School Zones Act did not fall within that category of 
regulatable activity. Not one of those considerations applies 
to section 183(e) of the Clean Air Act.

 The Court held, first, that "in those cases where we have 
sustained federal regulation of intrastate activity based upon 
the activity's substantial effects on interstate commerce, the 
activity in question has been some sort of economic endeav-
or." Id. at 4355 (citing Lopez, 514 U.S. at 559-60). Morrison 
noted that the criminal statute at issue in Lopez " 'had 
nothing to do with "commerce" or any sort of economic 
enterprise, however broadly one might define those terms.' " 
Id. at 4354 (quoting Lopez, 514 U.S. at 561). It said that the 
same was true of the federal civil remedy provision of the 
Violence Against Women Act (VAWA).26 See id. at 4355. 
But the same cannot be said of the Clean Air Act provisions 
concerning VOC emissions, which permit regulation only of:

__________
 25 18 U.S.C. s 922(q)(1)(A).

 26 42 U.S.C. s 13981.

 (i) manufacturers, processors, wholesale distributors, or 
 importers of consumer or commercial products for sale 
 or distribution in interstate commerce in the United 
 States; or
 
 (ii) manufacturers, processors, wholesale distributors, or 
 importers that supply the entities listed under clause (i) 
 with such products for sale or distribution in interstate 
 commerce in the United States.
 
42 U.S.C. s 7511b(e)(1)(C).

 Second, Morrison noted that in Lopez, the Gun-Free 
School Zones Act, like VAWA, "contained 'no express juris-
dictional element which might limit its reach to a discrete set 
of firearm possessions that additionally have an explicit con-
nection with or effect on interstate commerce.' " Morrison, 
68 U.S.L.W. at 4355 (quoting Lopez, 514 U.S. at 562). As 
quoted above, however, EPA's regulation of VOCs is express-
ly limited to entities that act "in interstate commerce." 42 
U.S.C. s 7511b(e)(1)(C).

 Third, Morrison pointed out that neither the Gun-Free 
School Zones Act, " 'nor its legislative history contain[s] ex-
press congressional findings regarding the effects upon inter-
state commerce of gun possession in a school zone.' " Id. 
(quoting Lopez, 514 U.S. at 562). The legislative history of 
the Clean Air Act Amendments, by contrast, expressly de-
scribes the problem of interstate transport of ozone, see, e.g., 
S. Rep. No. 101-228, at 3, 13, 49 (1989), as well as its effects 
on the national economy, see, e.g., id. at 8-9.

 Finally, according to Morrison, the "decision in Lopez 
rested in part on the fact that the link between gun posses-
sion and a substantial effect on interstate commerce was 
attenuated," Morrison, 68 U.S.L.W. at 4355, which the Court 
said was true of gender-motivated violence as well, see id. at 
4356. But, there is nothing attenuated about the interstate 
effects of the activity regulated here. We ourselves have 
noted the interstate nature of the "ozone transport phenome-
non," and the way in which it may render any given state 
unable to achieve attainment because of ozone created hun-
dreds of miles away. See Virginia v. EPA, 108 F.3d 1397, 
1400 (D.C. Cir. 1997). The legislative history and EPA's 

report to Congress substantiate the heavy impact ozone pollu-
tion has on national health care costs and national agricultur-
al production. See S. Rep. No. 101-228, at 8-9 (1989); Report 
at 1-1 (J.A. at 518). And the rulemaking record sustains the 
proposition that the large majority of the products regulated 
by the rule are distributed nationally, and then applied by 
end-users in multiple locations, see 63 Fed. Reg. 48,792, 
48,804--facts that are confirmed, and stressed, by the Nation-
al Paint & Coatings Association, see NPCA Br. at 24.

 In short, none of the considerations that led the Court to 
find Congress' authority wanting in Lopez and Morrison has 
any application to section 183(e) of the Clean Air Act. In 
Hodel v. Virginia Surface Mining and Reclamation Ass'n--a 
case cited with approval by the Supreme Court in both Lopez 
and Morrison, see Lopez, 514 U.S. at 557; Morrison, 68 
U.S.L.W. at 4354--the Court declared that it "agree[d] with 
the lower federal courts that have uniformly found the power 
conferred by the Commerce Clause broad enough to permit 
congressional regulation of activities causing air or water 
pollution, or other environmental hazards that may have 
effects in more than one State." 452 U.S. 264, 282 (1981). 
Contrary to Allied's assertion, nothing contained in the 
Court's recent Commerce Clause jurisprudence casts doubt 
on the validity of that declaration here.

 VII

 For the foregoing reasons, we reject petitioners' challenges 
to the architectural coatings rule and deny the petitions for 
review.